and affirm the denial of habeas corpus based on this claim of error.

### 6.   *Challenge to the testimony of the serologist about untyped blood that was found on Campbell's shoes*

Campbell's eighth claim of error charges that his constitutional rights were violated by the testimony of Denise Cargo, the serologist who stated that the blood found on Campbell's shoes was human blood, even though its type was never determined.  The district court concluded that this argument was simply a challenge to the probative weight of the evidence, not its admissibility.  Because "the State produced other, sufficient evidence of guilt," the district court concluded that "the blood evidence and testimony did not have a substantial influence on the verdict."  We agree with the district court's conclusion and, therefore, we affirm the denial of habeas corpus based on Campbell's eighth and final claim of error.

### III.  CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0250P (6th Cir.)
File Name:  01a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JEROME CAMPBELL,
         *Petitioner-Appellant,*

         *v.*                                        No. 99-3775

RALPH COYLE, Warden,
         *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-00711—Sandra S. Beckwith, District Judge.

Argued:  December 5, 2000

Decided and Filed:  August 1, 2001

Before:  RYAN, BOGGS, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Joseph E. Wilhelm, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant.  Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Joseph E. Wilhelm, David H. Bodiker, Pamela Prude-Smithers, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION,

Columbus, Ohio, for Appellant.  Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, Claude N. Crowe, ASSISTANT ATTORNEY GENERAL, Cincinnati, Ohio, for Appellee.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  Petitioner Jerome Campbell was convicted in 1989 of aggravated murder and sentenced to death by a jury in Hamilton County, Ohio. The Supreme Court of Ohio affirmed his conviction on direct appeal.  Campbell's two petitions for state post-conviction relief were also unsuccessful.  He then filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio.  When the district court denied the writ, Campbell appealed.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

On the night of December 23, 1988, Henry Turner, a 78-year-old resident of Cincinnati, Ohio, was murdered by an intruder in his apartment.  Turner bled to death after being stabbed five times by a knife taken from his own kitchen. There were two wounds in his chest, one in his chin, one in his thumb, and one in his wrist.  The wound to the thumb was described by the coroner as a "defensive wound."  Turner's body was found with the knife still stuck in his wrist.  The body was discovered on December 24, 1988 by another tenant of the apartment building, Leon Callins, a neighbor who had visited Turner the night before.

According to Callins, Turner's apartment was usually kept neat and clean, but the condition in which he found the

direct appeal to the Ohio Court of Appeals.  Because Officer Camden was apparently doing nothing more than summarizing his conversation with Campbell, we agree with the district court's conclusion that trial counsel's failure to object to or appeal the admission of this testimony was not deficient under *Strickland*.  We therefore  affirm the denial of habeas corpus based on Campbell's sixth claim of error on appeal.

### 5.    *Challenge to the allegedly false statements by Clardy and Roseman that they received no consideration for their testimony*

Campbell's seventh claim of error challenges the fact that, according to him, the state withheld information that shows that these two informants, despite their testimony to the contrary, received deals with the state as compensation for their favorable testimony as to Campbell's guilt.  If correct, such withholding of evidence would be a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Even if the state did withhold such evidence, however, habeas corpus may be granted only if "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

The district court rejected this claim of error, concluding that there is no reasonable likelihood that the allegedly false testimony could have affected the jury's judgment. Furthermore, Campbell's charge of falsity is considerably diminished by the fact that both Clardy and Roseman independently recalled specific details concerning the murder, such as Donna Roberts's observation of Campbell on the night in question.  These are details they would not have known about unless so told by Campbell.  The district court also pointed out that, even if the testimony of both of these jailhouse informants had been rejected by the jury altogether, the evidence of Campbell's guilt was so overwhelming that there was no reasonable probability that Campbell would have been acquitted. We agree with the district court's analysis,

evidence to convince the jurors beyond a reasonable doubt of every essential element of the crime charged in the indictment." Because the trial court had correctly stated the elements of aggravated burglary elsewhere in its instructions, as well as the requirement that the jury must find that each element was proven beyond a reasonable doubt, the district court concluded that counsel's failure to object was not constitutionally deficient. We agree with this holding. The district court's decision to deny Campbell's habeas corpus claim based on this claim of error is therefore affirmed.

### 4.   *Challenge to Officer Camden's testimony*

Campbell's sixth claim of error is based on the following testimony by Officer Camden:

I made the statement to him that I felt that he had committed burglaries before with people in the house asleep. At that point he says, 'yeah I did.' And then he said – he said, however, that he believed that he was committing burglaries in this case, the only difference was – no, I told him the only difference was – is that this time Turner woke up and he killed him.

Campbell challenges this testimony on two grounds. First, he claims that this evidence constituted impermissible opinion testimony on an issue that the jury must decide. Second, he argues that this testimony was proffered as impermissible character evidence to show Campbell's propensity to commit the crime charged.

The Ohio Supreme Court, after finding that Campbell did not object to this testimony at trial, concluded that he had waived this issue. Accordingly, the district court held that this claim was procedurally defaulted pursuant to *Maupin*, 785 F.2d at 138. We agree with the district court's conclusion.

The district court also rejected Campbell's claim that he was provided with ineffective assistance of counsel when this claim of error was not pursued by his counsel at trial or on

apartment the next morning was not the way he had seen it the night before. The kitchen door appeared to have been pried open, the refrigerator had been moved, the door to the bedroom was damaged, and the bedroom was in disarray. Turner, who was known to be a local bootlegger, had a liquor cabinet in his living room that was found open, and the television in that room had been turned on its side. Callins testified that when he had visited Turner the previous day, the liquor cabinet had been closed and locked – the way it was "always" kept – and the television had been upright and turned on. Clarence Caesar, a criminal investigator who testified at trial, gave his opinion that the apartment had been forcefully entered by the assailant.

One of the police officers investigating the crime scene, Ronald Camden, questioned Turner's neighbors. Among the people questioned was Donna Roberts, a woman who lived in the building next to the one in which Callins and Turner lived. Roberts told Officer Camden that sometime late in the evening on December 23, 1988, she was walking toward her apartment building when she was startled by a man leaning up against a nearby vacant building. She testified that he was scarred on his face and was wearing dark pants. After greeting him, she continued on her way to her apartment.

Roberts also said that the man was familiar to her, and that she and others who knew him referred to him as "scarface." She later identified this man as Campbell. According to Roberts, she had recognized him from when he had formerly lived in the same building as Turner and Callins. After talking to Roberts and other residents of Turner's building, Officer Camden learned that Campbell had previously lived on the third floor of Turner's building and, further, that Campbell's face was severely scarred with burn marks.

The police continued to question all who had access to Turner's apartment, and all who might have visited him. At the same time, Caesar, the criminal investigator with the Cincinnati police, identified a palm print above the lock on the door leading from the hallway into Turner's apartment, as

well as a fingerprint on a lightbulb that had been lying on the floor outside. Both prints belonged to Campbell.

Based on all of this information, Campbell became the prime suspect in Turner's murder. On December 30, 1988, Officer Camden and several other officers arrived at the home of Pamela Campbell, Campbell's sister, where they discovered and arrested Campbell. Pamela Campbell gave the officers permission to search her apartment. From this search, they seized a half-full bottle of Bacardi rum, a pair of handcuff keys, and a pair of gym shoes with the left heel missing. The shoes were stained with what appeared to be blood.

Following the search, Officer Camden questioned Campbell after giving him the appropriate *Miranda* warnings. Campbell admitted that he had purchased liquor from Turner in the past, but denied having recently seen him. During the trial, Officer Camden gave the following summary of what was said during his interrogation of Campbell:

A    I made the statement to him that I felt that he had committed burglaries before with people in the house asleep. At that point he says, "yeah I did." And then he said – he said, however, that he believed that he was committing burglaries in this case, the only difference was – no, I told him the only difference was – is that this time Turner woke up and he killed him.
Q    Did he deny that?
A    He denied that.

Campbell communicated frequently with his estranged girlfriend, Estella Roe, prior to his trial. During these conversations, by phone and in person, he would simultaneously admit to the murder and then deny having committed the crime. Campbell also repeatedly requested Roe to lie for him by telling the police that the two had been together on the night of the murder. He also wrote a letter to Roe, again requesting that she lie in order to create an alibi,

### 3.    *Challenge to the jury instructions based on Campbell's claim that the trial court improperly defined "aggravated burglary" and "theft offense"*

In his fifth claim of error, Campbell challenges the following jury instruction:

Purpose to commit a theft offense is an essential element of aggravated burglary.
. . . .
A theft offense is committed when someone without the consent of the owner knowingly obtains or exerts control over the property of another with [the] purpose to permanently deprive the owner of such property. Under Ohio law, aggravated burglary is a theft offense.

Campbell claims that this last sentence in the above-quoted instruction directed a verdict on aggravated burglary, due to its apparent circularity. The instruction seems to say that (1) a theft offense is an element of aggravated burglary and (2) aggravated burglary is a theft offense.

Nevertheless, Campbell's attorneys did not object to these instructions at trial. Campbell raised this claim in the Ohio Supreme Court, which held that the claim was waived. In addressing this claim of error, the district court found the claim to be procedurally defaulted based on the same reasoning as applied to the first jury instruction discussed in Part C.1. above. We agree with the district court's conclusion that the merits of this claim of error may not be addressed on federal habeas review.

Campbell also claims that his trial counsel were unconstitutionally ineffective when they failed to object to these instructions. The district court rejected this claim, finding that it was not unreasonable for his attorneys to conclude that, taken as a whole, the jury instructions did not threaten Campbell's constitutional rights. In its opinion, the district court pointed out that prior to the circular theft-offense definition quoted above, the state court had "previously instructed the jury that the State was required to produce

Campbell realleged this claim of error. The district court found that these grounds for relief were procedurally defaulted.

We agree with the district court's conclusion that (1) the Ohio Supreme Court actually applied a state procedural bar, (2) the Ohio Supreme Court's application of the procedural default was independent of federal law, (3) this procedural bar is consistently applied, and (4) Campbell has not proven cause and prejudice to excuse the procedural default. Thus, according to *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), Campbell may not pursue this challenge on federal habeas review. We therefore affirm the district court's denial of habeas corpus based on Campbell's second claim of error.

### 2. *Campbell's trial counsel did not provide ineffective assistance of counsel when they failed to object to the above jury instructions*

In Campbell's third claim of error, he challenges his trial counsel's failure to object to the instructions quoted above, which he alleges lowered the burden of proof otherwise placed upon  the state regarding purposefulness.  He also challenges their failure to object to the instruction on the causation prong of aggravated murder, where the trial court informed the jury, in essence, that it could conclude that Turner's death was a forseeable result of Campbell's actions. According to Campbell, this instruction undermined the requirement that he have formed the specific intent to kill in order to satisfy the mens rea element of aggravated murder. These challenges were rejected by the district court because, even if the challenges had merit as to the particular language in question, the instructions as a whole correctly described the elements of purposefulness, specific intent, and causation. We agree with the rulings of the district court regarding these instructions,  and therefore affirm its denial of habeas corpus relief based on Campbell's third claim of error.

and detailing what she should say. Roe turned the letter over to the police and ultimately testified at trial as a state witness.

While Campbell was in jail awaiting trial, he came in contact with two other inmates, Ronys Clardy and Angelo Roseman.  According to both of these men, Campbell admitted to the murder on at least two separate occasions. Clardy, who was being held pending trial on a robbery charge, testified that, in January of 1989, Campbell described in detail the events surrounding Turner's murder.  According to Clardy, Campbell told him that on the night of December 23, 1988, he broke into Turner's apartment, took a knife from the kitchen, and went into the bedroom to go through another liquor cabinet located there.  When Campbell knocked something over, Turner awoke.  Turner then attempted to get a gun, but was stopped by Campbell, who started stabbing him. Clardy also testified that Campbell recalled having seen a woman outside of the apartment building heading for a bar on the night of the murder.

Roseman, who was also being held in jail on a robbery charge, related a similar conversation that he had with Campbell in January of 1989.  At trial, Roseman testified as follows:

A    . . . He said he went over to rob the guy. And when he get over there, dude wasn't going for it, old man wasn't going for it.  The struggle came, he had to take him out. Exact words, he had to take him out.
Q    Take him out?
A    Take him out.
Q    What did you perceive he meant by that?
A    Took him out. Killed him, I guess . . . .
Q    Okay. Did he say anything else at that point?
A    Then he said – that after he took him out and came out, he said he know the girl didn't see him. That's what he kept talking about, the girl. He said that's the only way they could get me is the girl. I know she didn't see me. And that's the only thing he was worried about was the girl seeing him.

Both Clardy and Roseman testified at trial that they had independently contacted the police with the information regarding these confessions and, further, both denied making any deals in exchange for their testimony.

## B.    Trial proceedings

On January 9, 1989, Campbell was charged with aggravated murder pursuant to Ohio Rev. Code § 2903.01(B) ("No person shall purposely cause the death of another . . . while committing . . . aggravated burglary or burglary."). His three-day trial, which commenced on May 3, 1989, was divided between the guilt phase and the penalty phase.  At the guilt phase of Campbell's trial, the state called Callins, Roberts, Officer Camden, criminal investigator Caesar, Roe, Clardy, and Roseman as fact witnesses.  In addition, the state presented as expert witnesses a pathologist who described the nature of Turner's wounds and a serologist who testified that Campbell's shoes had been stained by human blood.  The serologist did not, however, determine the blood type.

Before closing arguments, Campbell's counsel requested that the jury be instructed on involuntary manslaughter as codified in Ohio Rev. Code § 2903.04(A) ("No person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony.") as a lesser-included offense to aggravated murder. The only difference between the two offenses is that aggravated murder requires proof of a purposeful killing, while involuntary manslaughter does not. *See State v. Thomas*, 533 N.E.2d 286, 288 (Ohio 1988).  This request was denied by the trial court.  After instruction and deliberation, the jury returned with a verdict of guilty on the charge of aggravated murder and two counts of aggravated burglary.

At the next phase of trial, the penalty phase, Campbell presented his sister, Pamela Campbell,  and a psychologist, Dr. David M. Chiappone, as witnesses.  Campbell's sister testified to the fact that at age five, both she and her brother were victims of a house fire that was the source of Campbell's scarred face.    Dr. Chiappone discussed Campbell's

closing argument at the mitigation phase was "grossly substandard." Furthermore, the other evidence presented by trial counsel raised their performance above the minimum level of competence required by *Strickland*.

We therefore find that the conclusion of the Ohio Court of Appeals – that Campbell's attorneys did not provide such substandard performance as to violate the first *Strickland* prong  – was not an objectively unreasonable one. Accordingly, we need not address whether the Ohio court's conclusion as to the prejudice prong was also objectively reasonable within the meaning of 28 U.S.C.  § 2254.  The district court's denial of habeas corpus based on Campbell's fourth claim of error is therefore affirmed.

## D.    The district court did not err when it denied Campbell's petition for habeas corpus relief based on his six remaining claims of error

### 1.    Challenge to the jury instructions based on Campbell's claim that the trial court reduced the state of Ohio's burden of proof

In Campbell's second claim of error, he challenged the trial court's jury instructions on the elements of aggravated murder, which described purposefulness as follows:

A person acts purposefully when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature.

He argues that this instruction relieved the state of its burden of proof on mens rea.  For the same reason, he also challenged the instruction that stated that "the purpose to kill may be inferred from the use of the weapon."

Because Campbell's attorneys failed to object to these instructions at trial, the Ohio Supreme Court rejected these arguments as waived.  In his federal habeas petition,

Finally, Campbell takes issue with his trial counsel's decision to forgo a lengthy and technical argument to the jury at mitigation based on the psychological effects of the fire on Campbell's behavior. Rather, his attorneys asked the jury to just look at his scars, and to reach their own conclusion as to the effect that such childhood trauma had upon him. Instead of focusing on the testimony of Dr. Chiappone, Campbell's trial counsel suggested that each juror's common understanding of what Campbell must have gone through as a child should inform their verdict.

This strategy, Campbell claims, was an objectively unreasonable one. As *Strickland* pointed out, however, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Even if the strategic choices made by Campbell's trial counsel are subject to challenge because their investigation was less than "thorough," we cannot say that his lawyers' decision to argue in lay terms, rather than relying upon the technicalities of psychotherapy, was an objectively unreasonable one.

Campbell relies on a Seventh Circuit case, *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), to support his challenge to the strategy of his trial counsel. In *Kubat*, the petitioner questioned his trial counsel's references in closing argument to "vengeance," "an eye for an eye," the alcohol that the defendant consumed on the day of the murder, and a comparison between the defendant and the victim. *Id*. at 368. The Seventh Circuit agreed with the defendant, holding that "this grossly substandard argument," plus the lack of presentation of any other mitigation evidence (even though there were fifteen available character witnesses), constituted the ineffective assistance of counsel. *Id*.

*Kubat*, in our opinion, does not support Campbell's argument. Campbell's attorneys pursued several available mitigation witnesses, pleaded with Campbell to allow his parents to testify, and had a clinical psychologist testify as to the defendant's mental condition. We do not find that the

psychological makeup, and diagnosed Campbell as engaging in polysubstance abuse, having a personality disorder, and being "antisocial," "angry," and "narcissistic." Following this testimony, the jury sentenced Campbell to death after determining that, beyond a reasonable doubt, the aggravating factors outweighed the mitigating factors.

## C.  Post-trial proceedings

The Ohio Supreme Court affirmed Campbell's conviction on direct appeal. *See State v. Campbell*, 630 N.E.2d 339 (Ohio 1994). His first petition for state post-conviction relief was subsequently denied by the state trial court, a decision that was affirmed on appeal by the Ohio Court of Appeals. *See State v. Campbell*, 1997 WL 5182 (Ohio Ct. App. Jan. 8, 1997). Campbell also filed a successive state petition which the Ohio courts declined to entertain.

On August 1, 1997, Campbell filed his petition, pursuant to 28 U.S.C. § 2254, for federal habeas corpus relief. The petition was timely filed, *see* 28 U.S.C. § 2244(d) (establishing a one-year statute of limitations on all habeas petitions), and raised 31 claims for relief. Discovery was granted by the district court on two of his claims. Following a hearing on Campbell's habeas petition, the district court rendered its decision on March 18, 1999. In a 404-page exhaustive opinion, the court rejected all of Campbell's claims for relief and denied his petition for a writ of habeas corpus.

Eight of Campbell's claims of error were certified for appeal and are addressed in this opinion. Specifically, Campbell argues that (1) his constitutional rights were denied when the state trial court declined to instruct the jury on the lesser-included offense of voluntary manslaughter, (2) the jury instructions impermissibly reduced the "beyond a reasonable doubt" burden of proof on the issue of Campbell's intent, (3) he was denied the effective assistance of counsel when his trial attorney failed to object to the jury instructions at issue in the second claim of error, (4) he was denied the effective assistance of counsel when his trial counsel failed to present

evidence of Campbell's alleged post-traumatic stress disorder (resulting from the fire he survived as a child) at the guilt and penalty phases of trial, (5) the jury instructions directed a verdict on the issue of whether Campbell had committed a "theft offense," an element of aggravated felony murder (he also alleges the ineffective assistance of counsel for failure to object to these instructions), (6) Officer Camden's testimony was unconstitutionally prejudicial (he also alleges the ineffective assistance of counsel for failure to object to this testimony), (7) the testimony of informants Clardy and Roseman was false, and the state of Ohio withheld impeaching evidence about these two witnesses, and (8) the testimony of the serologist violated his due process rights. The second, fifth, and sixth claims of error involve issues that the defense neither objected to at trial nor raised on direct appeal. Thus, the district court held that these three claims were procedurally defaulted.

At oral argument, Campbell's counsel stated that the first and fourth claims of error – challenging the omission of the lesser-included offense instruction and trial counsel's failure to elicit evidence of Campbell's alleged post-traumatic stress disorder – were the strongest claims. After a thorough review of the record and the relevant law, we agree that these two claims present the closest, most significant issues in this habeas petition. Accordingly, we focus most of our attention on these two claims.

## II.   ANALYSIS

### A.   Standard of review

Campbell's federal habeas corpus petition was filed more than a year after the date the Antiterrorism and Effective Death Penalty Act (AEDPA) became effective. The provisions of AEDPA are therefore applicable. *See Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000). Under AEDPA, a federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if

in a concurrence, *United States v. Kozminski,* 821 F.2d 1186, 1206 (6th Cir. 1987) (en banc) (Krupansky, J. concurring), and an Ohio Supreme Court case in which PTSD was acknowledged as a potential mitigator, *State v. Lawrence*, 541 N.E.2d 451, 457 (Ohio 1989), as well as a few contemporary law review articles in which PTSD was discussed at length as an insanity defense. *See, e.g.,* James Carroll, *Post-traumatic stress disorder as an Insanity defense in Vermont*, 9 Vt. L. Rev. 69 (1984). Campbell thus concludes that "a reasonable attorney in 1989 would have been alert to the probability of PTSD on the facts of this case."

This argument strikes us as contrary to the teachings of *Strickland*. Even though Dr. Chiappone as a trained psychologist failed to detect any evidence of PTSD, Campbell asks us to declare that his counsel's independent failure to make the same diagnosis is an objectively unreasonable mistake, depriving him of his Sixth Amendment right to the effective assistance of counsel. There is no evidence that Dr. Chiappone was incompetent, or that Campbell's lawyers had any reason to question Chiappone's professional qualifications. *See Skaggs v. Parker*, 235 F.3d 261, 273-74 (6th Cir. 2000) (holding that an attorney's decision to put a fraudulent and inept psychologist on the stand at the penalty phase of a trial, despite his notice of the therapist's ineptitude, constituted the ineffective assistance of counsel).

We conclude, therefore, that it was objectively reasonable for Campbell's trial counsel to rely upon Dr. Chiappone's diagnosis and, further, trial counsel's failure to independently diagnose PTSD was not unreasonable. *See Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993) ("Despite all of Stallings's efforts, Pruett would have us find that Stallings [Pruett's attorney] should have known that Pruett suffered from mental illness, organic brain damage, developmental problems, and post-traumatic stress disorder, and that Tsao's evaluation was flawed. We cannot reach that result. An attorney is not required to be so expert in psychiatry.").

mitigation evidence that was not presented at trial, but that might support an alternative theory of mitigation, constitutes proof of counsel's ineffectiveness when, as here, the record demonstrates that counsel presented the case in mitigation competently in view of the facts available to them.

*See State v. Campbell*, 1997 WL 5182, *6, Appeal No. C-950746 (Ohio Ct. App. Jan. 8, 1997).

We also note that, unlike in *Seidel* and *Glenn*, Campbell has not pointed to anything in his childhood medical records indicating that he has either PTSD or some form of brain damage. He has never been diagnosed or treated for PTSD, whereas the medical records in *Seidel* explicitly noted the defendant's mental afflictions. *See Seidel*, 146 F.3d at 755-56. At most, Campbell's childhood medical records would have provided another list of people to interview. These former physicians and healthcare workers, Campbell argues, would have been able to expose his mental condition.

This is much too tenuous a claim to support the conclusion that Campbell was prejudiced by his attorneys' failure to look into his childhood medical records. Indeed, even the psychological experts proffered by Campbell in his state post-conviction proceeding did not rely on these medical records to support their conclusion that he might have PTSD. To the contrary, their conclusions were based primarily on the same information available to Dr. Chiappone, i.e., the fire, Campbell's general medical history, and his resistance to having his own parents testify on his behalf. There is thus no reason to believe that Dr. Chiappone's diagnosis would have been any different even if he had seen the childhood medical records in question.

Campbell's second asserted omission is that "[c]ounsel were also deficient because they were ignorant of PTSD. A reasonable attorney handling a capital case in 1989 would have suspected that Jerome Campbell suffered from PTSD based on the facts and circumstances of his case." He cites two cases, a Sixth Circuit case in which PTSD was discussed

the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA also imposes a deferential standard of review on findings of fact made by a state court during a petitioner's direct appeal and state collateral attack. The applicable provision states that

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). We review the district court's conclusions of law in the application of these rules de novo, and its factual findings are reversed only if they are clearly erroneous. *See Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

The Supreme Court recently elaborated on the meaning of AEDPA's statutory language, pointing out that the revised habeas statute "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). In *Williams*, the Court held that a state-court decision is "contrary to" Supreme Court precedent if either the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." *Id*. at 405.

In contrast, a state-court opinion runs afoul of the "unreasonable application" clause of AEDPA when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts." *Id*. at 413. A state-court opinion can also engender the "unreasonable application" of Supreme Court precedent if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000).

The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

**B.   The state court's determination that Campbell was not constitutionally entitled to a lesser-included offense instruction was not objectively unreasonable**

Campbell's first challenge to his conviction is based on the assertion that his Eighth and Fourteenth Amendment rights were violated by the state trial court when it rejected his request to instruct the jury on the lesser-included offense of involuntary manslaughter. *See Gunnell v. Lazaroff*, 734 N.E.2d 829, 829 (Ohio 2000) (stating that involuntary manslaughter is a lesser-included offense of aggravated murder under Ohio law). This claim of error is based on the Supreme Court case of *Beck v. Alabama*, 447 U.S. 625 (1980), in which the Court held that it is unconstitutional to impose the death penalty when a "jury [is] not permitted to consider a verdict of guilt of a lesser included non-capital

This court has also granted the writ to a habeas petitioner whose attorney both failed to look into any of the defendant's medical records or interview any of the defendant's family members or others who knew him. *See Glenn v. Tate*, 71 F.3d 1204, 1208 (6th Cir. 1995). The most critical mistake, however, occurred when Glenn's lawyers failed to communicate with the court-appointed psychologists, who were of the opinion that there was no psychosis, retardation, or brain damage. *See id*. The defense was taken by surprise when they so testified at trial. On habeas review, however, Glenn proffered several mental health professionals who expressed the contrary conclusion that he suffered from global brain damage. *Id*. at 1208.

As in *Seidel*, had Glenn's counsel consulted with the court-appointed experts prior to trial, or looked into Glenn's medical history, replete with evidence of mental disabilities, they would have been alerted to their client's mental deficiencies that would have been highly influential at both the guilt and penalty phases of trial. Campbell's attorneys, in contrast, pursued various avenues of investigation, including psychological evaluation and witness interviews.

Implicit in Campbell's argument about his childhood medical records is the suggestion that his attorneys ignored the fact that he was a victim of a terrible fire as a child, and that this trauma affected him as an adult. To the contrary, as is apparent in the above-quoted portions of his attorneys' closing argument, Campbell's trial counsel spent a significant amount of time focusing on the likely effects of this childhood tragedy. Campbell is now simply suggesting that another strategy to highlight the trauma would have been more fruitful. Even if we were to agree with this assessment, we cannot conclude that his attorneys' strategic choice was objectively unreasonable. *See Strickland*, 466 U.S. 668, 689-90 (1984). This is essentially the same conclusion reached by the Ohio Court of Appeals when it stated:

Neither proof that defense counsel deviated from the "best available practice" nor proof of the existence of

In the case before us, trial counsel engaged in an extensive investigation of Campbell's history and current mental state. They interviewed family members, had Campbell evaluated by a clinical psychologist, and consulted with two mitigation specialists. The decision of Campbell's trial counsel to forgo a particular investigation, into Campbell's childhood medical records, therefore, must be evaluated with "a heavy measure of deference to counsel's judgment." *Workman v. Bell*, 178 F.3d 759, 769 (6th Cir. 1998) (internal quotation marks and citations omitted). We cannot say that this decision was objectively unreasonable.

In *Seidel v. Merkle*, 146 F.3d 750, 752 (9th Cir. 1998), a case relied upon by Campbell, the Ninth Circuit granted a habeas petition to a defendant because his attorney had failed to discover the defendant's brain damage and PTSD. Nevertheless, unlike the case before us, where trial counsel declined to pursue one avenue of investigation while focusing on others, the inadequacy of the attorney's investigation in *Seidel* was manifest. Seidel's trial counsel had both actual notice of his client's disorders (a conclusion the Ninth Circuit made when it pointed out that Seidel's counsel had written in his notes that his client had suffered from black outs, anger fits, and was about to be put on medication by prison mental health officials), as well as constructive notice (consisting of Seidel's having been medicated by a prison psychiatrist and having been at various mental hospitals). *See id*. at 756.

Despite this awareness that something was seriously wrong with his client's mental state, Seidel's counsel failed to review any of Seidel's medical records, declined to interview any witnesses about Seidel's medical condition, did not request a psychiatric evaluation of his client, and ignored various other aspects of his client's medical history. *See id*. Had he done any of those things, Seidel's attorney would not have missed his client's mitigating medical condition. In contrast, Campbell's attorneys did interview witnesses and, importantly, had Campbell evaluated by Dr. Chiappone, a mental health professional who also failed to diagnose Campbell's alleged PTSD.

offense, and when the evidence would have supported such a verdict." *Id*. at 627.

In *Beck*, the defendant and his accomplice broke into the house of an 80-year-old man. During the ensuing robbery, they tied up the elderly man and, according to Beck, the accomplice struck the man and killed him. Beck consistently maintained that he did not kill the victim, nor had he ever intended for the murder to occur. The state charged him with "robbery-intentional murder," a capital crime. Pursuant to the applicable state statute, the trial judge was prohibited from instructing the jury on the lesser-included offense of "felony-murder," a non-capital crime. The jury convicted Beck of intentional murder and he was sentenced to death. *Id*. at 629-30.

In holding that the denial of an instruction on the lesser-included offense violated Beck's constitutional rights, the Court focused on the accuracy of the factfinding process. A crucial element of the crime for which Beck was convicted was the element of intent. Nevertheless, the nature of Beck's intent was "very much in dispute at trial." *Id*. at 634. The Court found that the accuracy of the factfinding process was placed in doubt when the jury was deprived of the opportunity to consider the lesser-included offense of felony murder, which did not include the intent requirement. *See id*. at 637. When this situation occurs, the Court reasoned, jurors are more likely to convict a defendant despite their doubt as to one element in the greater offense, due to their abiding conviction that the defendant did *something* wrong. *See id*. at 632. Indeed, "the risk of an unwarranted conviction" increased, the Court concluded, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense" and the "third option" of the lesser-included offense is not presented to the jury, despite the existence of "some doubt with respect to an element that would justify conviction of a capital offense." *Id*. at 637. The Court therefore expanded the federal entitlement to "'an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense

and acquit him of the greater.'" *Id*. at 635 (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)).

Two years later, in *Hopper v. Evans*, 456 U.S. 605 (1982), the Supreme Court reaffirmed the holding of *Beck*, as well as the limitations of the new rule that were evident but unexplored in the *Beck* opinion. The habeas petitioner in *Hopper* had been convicted of robbery-intentional murder in Alabama, under the same statutory scheme present in *Beck*. During his testimony before the grand jury investigating the murder in question, Evans testified that the victim "was not the only person he had ever killed, that he felt no remorse because of that murder, that he would kill again in similar circumstances, and that he intended to return to a life of crime if he was ever freed." *Id*. at 607.

The Supreme Court held that Evans was not constitutionally entitled to a lesser-included instruction because the evidence did not support a verdict on the lesser charge, nor was there sufficient evidence to support a rational jury's conclusion that he should have been acquitted of the greater offense. *Id*. at 610. Because "[t]he evidence not only supported the claim that respondent intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim," the Court held that the absence of the lesser-included offense did not compromise accurate factfinding in the same way that it did in *Beck*, where the element of intent was vigorously contested. *Id*. at 613. According to *Hopper*, then, a *Beck* instruction is only required when "there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense," but not the greater. *Id*. at 610.

The *Beck* holding has been consistently followed by the courts, but it has always been restrained within the limits suggested by *Hopper*. *Beck* has never stood for the proposition that the Constitution mandates a jury-mediated plea bargain on a lesser charge, despite overwhelming evidence in support of the greater offense. Rather, the purpose of the rule is to facilitate accurate factfinding by the

circumstances, applying a heavy measure of deference to counsel's judgment.") (internal quotation marks and citations omitted).

Campbell begins his argument by claiming that his trial counsel's performance was so poor as to fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. He bases this alleged performance deficiency on three separate omissions by his trial counsel. The first omission claimed by Campbell is his attorneys' failure to investigate his medical records from when he was treated for burns as a child. According to the affidavit of James Crates, the mitigation specialist, those records would have indicated more names of people to interview, which "would have provided the defense team with insight as to Campbell's behavior, provided Dr. Chiappone with additional data of diagnostic import, and provided witnesses who could have imparted significant data to the trier of fact." Campbell argues that, but for counsel's decision not to investigate his childhood medical records, his alleged PTSD would have been discovered and utilized successfully in front of the jury at both phases of the trial. Based on the record before us, we cannot agree.

We acknowledge that an attorney's ignorance of the medical records of his client or of a key witness has been the source of successful habeas petitions in the past. *See, e.g., Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (holding that an attorney was unconstitutionally ineffective when he failed to discover medical records of the defendant as a child, in which the defendant was diagnosed as having so low an IQ as to be within a "Mentally Defective range"). Our inquiry, however, is a fact-intensive one that requires the reviewing court to look into the attorney's investigation as a whole in order to determine whether his or her performance was deficient. *See Strickland*, 466 U.S. at 690 ("Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case.").

perform any investigation into a defendant's case for mitigation has been held by this court to constitute the ineffective assistance of counsel. *See Carter v. Bell*, 218 F.3d 581, 595 (6th Cir. 2000) (finding ineffective assistance of counsel where the defendant's attorneys failed to investigate or introduce any evidence of mitigation at the sentencing phase, and relied solely on a theory of residual doubt). In holding that Carter's Sixth Amendment rights were violated, this court faulted the attorneys for relying solely on mitigation information volunteered by the defendant, rather than performing their own independent investigation. We stated that "counsel must make some effort at independent investigation in order to make a reasoned, informed decision." *Id.* at 596; *see also Cone v. Bell*, 243 F.3d 961, 975-79 (6th Cir. 2001) (granting habeas corpus under AEDPA based on the failure of the defendant's trial counsel to present any mitigation evidence or a closing argument at sentencing).

Nevertheless, we note that the cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim "does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation," the presumption of reasonableness imposed by *Strickland* will be hard to overcome. *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993) (holding that an attorney's reliance on the evaluation of the defendant's medical records by a professional he knew and trusted was not a violation of the Sixth Amendment).

Where a significant investigation has been conducted, and a habeas petitioner challenges the strong presumption that the attorney's investigation was reasonable, a court must look to the specific facts of the case, as well as the decisions of the defendant that may have hindered trial counsel's preparation. *See Workman v. Bell*, 178 F.3d 759, 769 (6th Cir. 1998) ("However, a particular decision not to investigate must be directly assessed for reasonableness in all of the

jury. A lesser-included offense instruction is therefore not required when the evidence does not support it, nor is the instruction mandated when it is precluded by a procedural bar, such as a statute of limitations. *See Spaziano v. Florida*, 468 U.S. 447, 454-57 (1984) (holding that a court did not violate the *Beck* rule when it declined to give a lesser-included offense instruction because the statute of limitations had passed on the lesser offense); *see also Hopkins v. Reeves*, 524 U.S. 88, 94-99 (1998) (holding that a *Beck* instruction is not required if the requested jury charge does not satisfy the legal definition of a lesser-included offense). This court has further held that, because *Beck* was a challenge based on the Eighth Amendment, the Constitution does not require a lesser-included offense instruction in non-capital cases. *See Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc).

Campbell bases his assertion that he was entitled to a lesser-included offense instruction solely on his evaluation of the evidence. According to Campbell, the issue of whether he intended to kill Turner was in dispute at trial. He maintains, then, that the jury could have possessed a reasonable doubt as to his guilt of aggravated murder, but because they were not presented with a "third option" of a lesser offense, they ignored these doubts and convicted him of the capital offense.

Campbell relies on two evidentiary arguments to support his claim. First, he argues that there was sufficient evidence of a struggle between himself and Turner to cast doubt on his intent to kill. This alleged struggle is reinforced, he argues, primarily by the fact that the coroner described the wound on Turner's thumb as a "defensive wound." Campbell also points to that portion of Roseman's testimony where the witness testified that

"[Campbell] didn't say he tried to kill the guy. He said he went over to rob the guy. And when he get over there, dude wasn't going for it, old man wasn't going for it. The struggle came, he had to take him out. Exact words, he had to take him out."

He also contends that the prosecutor conceded the existence of a struggle when arguing against Campbell's motion for acquittal. Campbell bases this contention on the statement in the prosecutor's argument where he said that "[the evidence] shows that [Turner] met his death through a stab wound, multiple stab wounds. After a complete struggle and the evidence shows a ransacking of his apartment." Campbell thus concludes that, because there was a struggle, his intent to kill Turner, as in *Beck*, was sufficiently in dispute as to require a lesser-included offense instruction.

Campbell's second evidentiary argument on which he bases his challenge to the denial of a *Beck* instruction is the fact that he was unarmed when he entered Turner's apartment. Because Turner was killed with his own knife, Campbell argues, and because the evidence suggests that Campbell entered the apartment unarmed, a reasonable juror could have concluded that Campbell did not possess the intent to kill the victim.

In sum, Campbell argues that, based on the evidence of a struggle and of an unarmed entry, a jury could have reasonably concluded that (1) Campbell lacked the requisite intent to satisfy the aggravated murder charge and (2) there was sufficient evidence to conclude that he was guilty of the lesser charge of involuntary manslaughter. Because he was deprived of this "third option," he claims that the jurors were forced to choose between acquittal, despite their belief that Campbell did commit a crime, and conviction for a capital crime in which their confidence in his guilt beyond a reasonable doubt was suspect.

The Ohio Supreme Court, when presented with this claim on direct appeal, disagreed with Campbell. *See State v. Campbell*, 630 N.E.2d 339, 349-50 (Ohio 1994). With respect to the argument regarding a struggle, the court noted that the evidence of a struggle "does not explain Turner's four other wounds." *Id*. at 349. Further, the court stated that although Campbell may not have intended to kill Turner when he entered the apartment, "the issue is not what Campbell

*Strickland*, 466 U.S. at 694. Taking into account the totality of the circumstances, as well as the relative strength of the case proffered by the prosecution, a court must "question . . . whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. Similarly, if a challenge is to the penalty phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*.; *see also Glover v. United States*, 531 U.S. 198 (2001) (clarifying the *Strickland* prejudice standard).

Because the Ohio Court of Appeals correctly stated the *Strickland* standard, we must decide whether its application of this rule was "objectively unreasonable." In the state court's analysis, it focused most of its attention on Campbell's challenge to the performance of counsel at the penalty phase and, further, based its holding primarily on the performance prong of the *Strickland* test. In its conclusion that Campbell's attorneys performed competently at the mitigation phase, the court noted that Campbell placed several restrictions on his trial counsel's ability to put together a mitigation strategy. Furthermore, the court characterized Campbell's claim as a challenge to the fact that he did not receive the best-available representation, rather than reasonably competent representation. Campbell contests these conclusions by stating that "his counsel failed to investigate, discover and present additional facts at trial about his Post-Traumatic Stress Disorder (PTSD)."

This court has held "that failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment." *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) (emphasis in original); *see also Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Indeed, a complete failure to

requires a court to take into account the skills a lawyer should possess, the guidelines of professional organizations such as the ABA, and the specific circumstances of each case. *See id.*

*Strickland* cautions, however, that any court applying this analysis must do so with tremendous deference to trial counsel's decisions. *See id.* at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (internal quotation marks and citation omitted).

Instead of requiring perfect performance, then, we must permit a "wide range of professionally competent assistance," especially regarding those strategic choices informed by "reasonable investigations." *See id*. at 690-91. As in the civil context, where we refuse to reverse the decisions of a jury so long as they were reasonably based on the evidence, an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken. *See White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000) ("The *Strickland* Court cautioned that courts must take care to avoid 'second-guess[ing]' strategic decisions that did not prove successful.") (alteration in original) (quoting *Strickland*, 466 U.S. at 689).

The second factor in this analysis is whether the defendant was materially prejudiced by the alleged errors of his or her trial counsel. Under this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

intended when he broke in, but what he intended when he stabbed Turner." *Id*. at 349-50. The court found that a reasonable juror would have been "compelled" to find that Campbell had possessed the intent to kill due to the "number and location" of the wounds.

Thus, as in *Hopper*, where the Supreme Court held that the testimony of the defendant simultaneously supported a finding of intent and negated a finding of no intent, the Ohio court determined that the number and location of the wounds would have compelled a reasonable juror to reach a verdict of aggravated murder. These are the conclusions that Campbell now asks us to review through the narrow lens provided by AEDPA.

At the outset of our analysis, we must address the threshold question of "whether [the habeas petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Because *Beck* dates back more than ten years before the Ohio Supreme Court ruled on the lesser-included offense claim, this question is easily answered in the affirmative. Furthermore, we also find that the Ohio Supreme Court applied the correct rule when analyzing this claim. It stated that "an involuntary manslaughter instruction is justified only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." *See Campbell*, 630 N.E.2d at 349 (internal quotation marks omitted).

This statement of the rule regarding a lesser-included offense instruction under the Eighth Amendment is indistinguishable from the holding of *Beck* and its progeny. We must therefore determine whether the state court's application of this rule to these facts was objectively unreasonable. *See Williams*, 529 U.S. at 409. Even if we were to disagree with the Ohio Supreme Court's conclusion that a jury could not have reasonably found against the state on the intent element of aggravated murder, we are not free to

grant Campbell's petition unless that holding was objectively unreasonable. Based on the evidence in the record, we conclude that Campbell has not satisfied this strict standard of review.

Key to the Ohio court's conclusion that no lesser-included offense instruction was constitutionally required was the lack of evidence to explain away all five wounds to Turner's body. The court never disputed the evidence of one "defensive wound," that a struggle ensued, or that Turner tried to ward off Campbell. Rather, the fact that there were four deadly wounds, the court reasoned, precluded a rational juror from finding the lack of a purposeful killing. *See Campbell*, 630 N.E.2d at 350 ("the number and location of his victim's wounds would compel any reasonable trier of fact to find intent to kill"). This "compelled" conclusion was not sufficiently negated by the evidence of a struggle. The Ohio Supreme Court's holding was thus not an unreasonable one. Campbell has yet to explain how the four deadly wounds could have been inflicted consistent with his theory that Turner's death was not intentional but, rather, solely the result of a struggle.

In support of his argument that the evidence of a struggle created a disputed issue of fact with respect to his intent, the only case from this court that Campbell is able to cite is *Drake v. Superintendent*, No. 95-4018, 1997 WL 14422 (6th Cir. Jan. 14, 1997) (unpublished table decision). The murder victim in *Drake* died from a gunshot wound fired from a weapon only three feet away. This court held that there was no evidence to negate intent, and that the evidence of the wounds showed a "purposeful killing" under Ohio law. *Id*. at *9. The court in *Drake*, however, noted the absence of a struggle in a short list of examples of nonexistent evidence that might have negated the defendant's intent. *Id*. ("Under the circumstances there was no evidence put forth that the shooting itself was unintentional, accidental, or *the result of a struggle* with Hudson; the evidence shows a purposeful killing.") (emphasis added). Campbell latches on to this

Further, the Ohio Court of Appeals noted that there was no "reasonable probability that, but for the alleged omissions of counsel, the result of the penalty phase of Campbell's trial would have been different." *Id*. at *7. The court, in another part of its opinion, again stated that the evidence did not sufficiently challenge the performance of Campbell's counsel, nor was there any proof that "the results of the guilt phase of Campbell's trial would have been different." *Id*. at *9. Campbell appealed this decision to the Ohio Supreme Court, which denied leave to review this holding. *See State v. Campbell*, 683 N.E.2d 1153 (Ohio 1997). The district court below also dismissed this claim as meritless.

Before we address the merits of Campbell's ineffective-assistance-of-counsel claim, we need to clarify what this issue does not entail. Campbell does not challenge the state court's provision of the assistance of an expert, nor does he challenge the effectiveness of Dr. Chiappone. *See Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000) (noting that a claim "that the petitioner is entitled to a competent expert in his defense" has never been "explicitly adopted by this Court"). Rather, Campbell argues that his attorneys should have known that his behavior was symptomatic of PTSD, or should have discovered this disorder by reviewing his childhood medical records. Had this discovery been made, Campbell argues that they could have presented this PTSD evidence to the jury at both the guilt and penalty phases, thereby improving his chances of acquittal or of a penalty less than death.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court detailed the now familiar two-pronged analysis that a court applies when presented with a Sixth Amendment challenge to the effectiveness of counsel. The first factor that a defendant making a claim of ineffectiveness must show is that the performance of his or her counsel was "below an objective standard of reasonableness." *Id*. at 688. Although this analysis was not defined in detail by the Court, it declared that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*. According to *Strickland*, then, such an analysis

Finally, Campbell produced the affidavit of James Crates, a mitigation specialist, who discussed the functions and typical duties of someone like himself. Crates concluded, based on his review of the transcript and other records regarding Campbell's medical history, that the preparation and presentation of mitigation evidence in this case had been inadequate. In particular, Crates criticized the infrequency of meetings between Campbell and the mitigation specialist hired by his attorneys, as well as the "cursory attempts at retrieving documentation as to significant episodic life events" that would have helped his case at the penalty phase. Because Campbell's childhood medical records were not retrieved, Crates pointed out that his attorneys were not exposed to the names of various physicians and nurses that treated him as a child. Furthermore, because there was only one meeting between Dr. Chiappone and Campbell, Crates maintained that there was no cohesive or convincing mitigation strategy. This, according to Crates, placed Campbell at a disadvantage.

We note that, despite all of this evidence, not one medical health professional has actually diagnosed Campbell with PTSD. At best, they concluded that he has some symptoms of the disorder. When presented with these same arguments and affidavits, the Ohio Court of Appeals rejected this claim in Campbell's state post-conviction motion. *See State v. Campbell*, No. C-950746, 1997 WL 5182, *6 (Ohio Ct. App. Jan. 8, 1997). As to the penalty phase argument, the court stated:

> Neither proof that defense counsel deviated from the "best available practice" nor proof of the existence of mitigation evidence that was not presented at trial, but that might support an alternative theory of mitigation, constitutes proof of counsel's ineffectiveness when, as here, the record demonstrates that counsel presented the case in mitigation competently in view of the facts available to them.

*See id*.

discussion in *Drake* to argue that any evidence of a struggle mandates a lesser-included offense instruction.

*Drake* does not so hold. Although we may infer from the analysis in *Drake* that a struggle might have cast doubt on the defendant's intent to kill, that is not to say that *any* evidence of a struggle mandates a *Beck* instruction. Indeed, if there had been a struggle in *Drake,* and if the defendant had shot the victim four more times rather than just once, it would not have been objectively unreasonable to conclude that, from the nature of those wounds, the defendant had possessed the intent to kill. The discussion in *Drake* would apply more directly to Campbell's case if all of Turner's wounds had in fact been "defensive wounds."

Despite the absence of any controlling case law supporting his claim regarding the struggle, Campbell reasons that, based on the nature of Turner's thumb wound, Roseman's testimony, and the prosecutor's statements, a jury could have reasonably concluded that he stabbed Turner "reflexively, with a purpose only to escape . . . or cause a non-fatal injury." This, however, would require us to hold that the Ohio Supreme Court's conclusion – that the nature and number of the wounds compelled a reasonable jury to find that Campbell possessed the intent to kill – was objectively unreasonable.

Campbell takes this argument one step further and argues that several Supreme Court cases support his proposition that "[t]he Constitution prohibits . . . conclusive inferences of the mens rea element from the mere use of a deadly weapon." These cases, however, are inapposite because they address the constitutional prohibition on placing conclusive presumptions on the elements of a crime *in the jury instructions. See, e.g., Francis v. Franklin*, 471 U.S. 307, 313 (1985) (the Constitution "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime"); *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979) ("Because David Sandstrom's jury may have interpreted the judge's instruction

as . . . a conclusive presumption . . . , and because either interpretation would have deprived defendant of his right to the due process of law, we hold the instruction given in this case unconstitutional."). In the present case, the Ohio Supreme Court held that the evidence of Turner's wounds would have compelled a reasonable jury to conclude that there was sufficient evidence of intent to convict Campbell of the greater offense. This is entirely different from a judge instructing the jury that it must reach a particular conclusion based on a presumption when the evidence is reasonably in dispute.

Indeed, even after taking into account Turner's thumb wound, Roseman's testimony, and the prosecutor's statement, the Ohio Supreme Court's conclusion based on the nature of the wounds was not objectively unreasonable under AEDPA's standards. Campbell has not shown that the court was unreasonable; he simply urges a different interpretation of the evidence. Federal law prohibits us from granting a habeas petition based on such an argument. *See Williams v. Taylor*, 529 U.S. 362, 411 (2000).

The Ohio Supreme Court also addressed Campbell's assertion that the evidence indicating that Turner was killed with his own knife placed Campbell's intent in dispute, requiring a lesser-included offense instruction. This argument was rejected by the state court when it determined that "the issue is not what Campbell intended when he broke in, but what he intended when he stabbed Turner." *State v. Campbell*, 630 N.E.2d 339, 349-50 (Ohio 1994). Further, the court noted that "[t]he state did not allege, and did not have to prove, prior calculation and design." *Id*. at 350. The Ohio Supreme Court thus concluded that, due to the nature and location of the wounds, the evidence still compelled a reasonable juror to conclude that Campbell developed the intent to kill Turner at some point between his entry into the apartment and the stabbing.

Campbell attempts to challenge the reasonableness of this conclusion by citing *Allen v. Morris*, 845 F.2d 610 (6th Cir.

case of the petitioner, that his potential for fear would likely be more exaggerated, based on his low average IQ, lack of parental support, and eventually the trauma which he experienced. Thus, one would expect his tendency for hypervigilance normally associated with pediatric burn victims, to be more pronounced and less remitting.

Although noting that pediatric burn victims do not always suffer from hypervigilance, Dr. Brams concluded that, based on Campbell's family history, he possessed many of the symptoms of PTSD. Further, Dr. Brams criticized Campbell's trial counsel for not "being more aware of his specific psychological difficulties, and for not recognizing that his resistance to various forms of help, such as the testimony of his parents, was a sign of PTSD; rather than just taking his desires at face value."

Dr. Newton Jackson, Jr., a licensed psychologist, also submitted an affidavit in support of Campbell's habeas petition. He offered a statement that essentially reiterated Dr. Brams's belief that, as a consequence of Campbell's catastrophic burning, it is likely that he developed symptoms of PTSD. Like Dr. Brams, Dr. Jackson criticized what he characterized as the lack of a thorough development, at mitigation, of the impact these injuries had upon Campbell. He also criticized Campbell's trial counsel and Dr. Chiappone for failing to comprehend that Campbell's adherence to positions contrary to his own best interests, such as the prohibition of his parents' testimony, was a product of this "threat sensitivity," and that the attorneys would have been able to overcome Campbell's objections had they made themselves aware of his PTSD symptoms and developed a better working relationship.

A fourth affidavit was submitted by a pediatric surgeon, Dr. Dennis King. He described the likely medical procedures needed to treat Campbell's burns, as well as the pain and discomfort that Campbell faced at the time of his injuries and subsequent treatment.

before it at the penalty phase, then it would have . . . humanized Jerome Campbell for the jury and, it would have provided a causal nexus between his mitigation and this offense." In support of these arguments, Campbell assembled affidavits from various experts.

First, he presented an affidavit of Dennis Day Lager, an attorney with significant experience in representing those accused of capital crimes, who described the goals and tactics of a typical defense lawyer in such cases. Nothing in Lager's statement explicitly critiqued the performance of Campbell's attorneys, nor was there any mention of whether a reasonable attorney would have anticipated, based on Campbell's life history and behavior, that he might have PTSD.

Second, Campbell produced the affidavit of Dr. Jolie S. Brams, a licensed psychologist with experience in pediatric-burn trauma. Dr. Brams, after reviewing Campbell's medical records, the trial transcript, the Department of Corrections's records related to Campbell's incarceration, and other documents, concluded that Campbell's behavior suggested PTSD. She described one of the more prominent characteristics of a PTSD sufferer, hypervigilance, as follows:

> Children in these medical settings are often times hypervigilant of their surroundings because there are often few cues provided them that signal the absence of impending adverse procedures. Simply stated, they must constantly be "on guard" for the next painful procedure that will occur. This hypervigilance interferes with other necessary components of healing, specifically eating and sleeping. This hypervigilant stance can become ingrained, especially in young children who are unable to differentiate the role of caregivers versus the pain they receive. . . . Jerome Campbell was injured when he was four years old. At that stage of cognitive development, most children are still dealing with looking at new experiences as potential threats. The period between three and five is one in which fears usually are pronounced. It would be reasonable to assume that in the

1988), in which, according to Campbell, a lesser-included offense instruction was rejected *because* the defendant was armed when arriving at the crime scene. He is correct insofar as the defendant in *Allen* entered the crime scene armed and verbally expressed his intent to kill the victim. Nevertheless, it is not clear from the summary disposition of the *Beck* issue in *Allen* what evidence this court relied upon when it held that "[b]ecause the evidence presented at Allen's state court trial was insufficient to support the requested lesser included offense instructions, the district court correctly concluded that this alleged constitutional error was also without merit." *Id.* at 617. We decline to read *Allen* as having created a formalistic rule in which we will require a *Beck* instruction whenever a defendant enters a crime scene unarmed. Such a rule would undermine Ohio's law that the intent to kill is not linked to the time interval between the formation of the intent and the act of killing. *See State v. Stewart*, 201 N.E.2d 793, 801-02 (Ohio Ct. App. 1963) (holding that a court may "draw from the evidence the inference of the fact that the accused intended to kill" and that such a finding of deliberation is not undermined by the short amount of time in which such an intent to kill was formed).

A decision as to whether a *Beck* instruction is required is a fact-specific inquiry in which a court must determine whether there were sufficient facts for a reasonable jury to conclude that such an intent did not exist. That was precisely the inquiry made by the Ohio court. Indeed, the core conclusion reached by the Ohio Supreme Court was that "the number and location of his victim's wounds would compel any reasonable trier of fact to find intent to kill." *Campbell*, 630 N.E.2d at 350. Campbell has produced nothing from the case law or the record that indicates such a conclusion was unreasonable.

We have found only one post-AEDPA case in which a habeas petition was granted based on *Beck*. *See Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999). In *Hogan*, the defendant was visiting the victim's home when an altercation erupted. The victim attacked the defendant with a knife that he managed to wrest away from her. As a result of this attack,

the defendant proceeded to stab the victim twenty times in the throat, head, neck, chest, and back.  The trial court refused to instruct the jury on heat-of-passion manslaughter.  In ruling on *Hogan's* habeas petition, the Tenth Circuit granted the writ because the defendant had stated that after he had taken the knife from the defendant, he was afraid she was going to the kitchen to find another knife.  This, plus the defendant's confession and their longstanding relationship, led the Tenth Circuit to find that sufficient evidence existed for the jury to have acquitted the defendant of intentional killing, but found him guilty of manslaughter.  The court came to this conclusion despite the "quantity and quality of the wounds." *Id*. at 1312.

Whether or not *Hogan* was correctly decided is an interesting question.  But the key distinction from the case before us is that the Tenth Circuit concluded that the findings of the state court were inadequate with respect to the *Beck* claim.  This meant that the habeas court was not bound by the strict standard of review imposed by AEDPA.  *See Hogan*, 197 F.3d at 1306.  Indeed, rather than deciding whether there was a reasonable dispute as to the element of an intent to kill, the Oklahoma state court in *Hogan* simply stated that the evidence supporting the conviction was sufficient.  *See id*.

This critical misapplication of Supreme Court precedent led the Tenth Circuit to conclude that  "there are no findings to which we can give deference."  *Id*.  In contrast, the Ohio Supreme Court concluded that the nature of Turner's wounds would have compelled a reasonable jury to find that Campbell intended to kill Turner.  Because this conclusion fits within the parameters of the *Beck* rule, and is not an objectively unreasonable application of *Beck*, we affirm the district court's denial of habeas corpus based on this claim.

statement that he had refused any more surgery after many operations, even if he felt that way I think there's a lot of indications that his problem had not been resolved. There was still a lot of anger and bad feelings in him.

On this same point, addressing the way in which the jury should view Campbell's childhood trauma, his other attorney stated:

I'm not suggesting to you for one minute that someone wherever should ever be excused for one's actions. People a lot smarter than me, psychologists, psychiatrist have made certain determinations. Not, [sic] I don't believe by way of excuse but by way of explanation.
I think it's important to understand how we get from one point to another. And I think it's more than an educational experience. It's more than a learning experience. I think it helps each and every one of us gain some insight into not only our own problems but the problems of others. And I think that's what we're talking about. Getting some insight. Explaining without trying to excuse.
I don't think it would be inappropriate and again insulting to come in here and try to excuse any type of behavior and ask you to dismiss that and to move on. But that's not what the suggestion is here. That's not what the purpose of Dr. Chiappone was.  It was to give you some explanation, to enlighten you if you will that there are other factors that he described.

According to Campbell, his trial attorneys' performance was constitutionally inadequate. Specifically, he claims that their failure to discover his alleged PTSD compromised his Sixth Amendment rights at both phases of the trial. Campbell's present attorneys maintain that at the guilt phase "Campbell's PTSD would have supported trial counsel's strategy of contesting Campbell's purpose to kill; had counsel made reasonable efforts to discover their client's PTSD." They also argue that "if the jury had this evidence of PTSD

This isn't any kind of mumbo jumbo where we bring in a psychiatrist to say what we want. You can see exactly what we're talking about. It's right there before you. No one's making up anything. The man is horribly disfigured at an early age. The man has started off life going into a normal life and then that was cut down because of an accident, because of a fire. And we're not – that's not a – anything that we're making up. You can see it right before your eyes. It's right here.

And as I said, this case is unique. Every case is unique. But this case is especially different because here you can see exactly a lot of the – you can see what caused a lot of this man's problems. And the thing that none of us have had to go through. Each of us as we stand here are normal, we're born that way, and we never had some intervention, something come in and affect us like that.

And I'm not saying – I'm sure as we all stand here everyone has problems and I'm not belittling those, but we can see that this man has had a major problem. And also I'd like to emphasize that although as the prosecutor alluded to, Pam also was burned. But I think you can clearly see Pam, his sister, Pam Campbell, she was not injured as badly and has a lot less – had a lot less trauma to her body than her brother did.

As you can see, Mr. Campbell's burns go right up to the top of his head. He can't – doesn't have any hair on that part of his head. And he is much worse disfigured.

And as I've also mentioned, every person is different. Perhaps you and I in that situation wouldn't have reacted that way. But there are people that have not had the strong family situations that perhaps we all came from and grew up differently. That they weren't in a part of the city where a lot of people were poor and uneducated and their parents perhaps were not telling them how to be polite to other children that had problems. And not to tease them and things of that nature.

And [I] also would like to mention that Mr. Campbell, although the psychiatrist or psychologist did testify that apparently he had accepted his situation when he was 14 or 15, or didn't actually say that but he's made the

## C. The state court's determination that Campbell's attorneys did not provide ineffective assistance of counsel when they failed to discover Campbell's alleged post-traumatic stress disorder was not objectively unreasonable

The other major issue in this appeal is contained in Campbell's fourth claim of error. In this claim, Campbell argues that he was deprived of the effective assistance of counsel, a right guaranteed to all criminal defendants. *See Strickland v. Washington*, 466 U.S. 668 (1984). According to Campbell, his trial counsel violated Campbell's Sixth Amendment rights by failing to discover and present evidence of his possible post-traumatic stress disorder (PTSD) at both the guilt and penalty phases of trial.

Based on the evidence presented in his state post-conviction proceedings, there is the possibility that Campbell suffers from PTSD, a medical condition stemming from being severely burned in a fire in 1965, when he was only five years old. As a result of this fire, Campbell suffered third-degree burns covering twenty percent of his body. These burns were concentrated in areas that are visible to others, such as his face, hands, and forearms. Despite ten years of surgery and various reconstructive procedures, he was still left with significant deformities and scarring in these areas of his body.

No evidence of PTSD was presented to the jury. Indeed, it appears that Campbell's trial counsel were not even aware that Campbell may suffer from this condition. At the penalty phase, prior to the presentation of any mitigating witnesses, Campbell's counsel brought to the court's attention the fact that Campbell, despite their urging, refused to permit his parents to testify as witnesses on his behalf. The judge questioned Campbell, confirming that he indeed wanted to impose this restriction on the presentation of his mitigation proof.

To aid in their presentation at this stage of the trial, Campbell's lawyers hired a mitigation specialist. They also received assistance from a mitigation expert with the Ohio

Public Defender's Office. Due to the limitations imposed by Campbell, however, his counsel presented only two mitigation witnesses – his sister, Pamela Campbell, and a clinical psychologist, Dr. David Chiappone. Pamela Campbell testified about the fire from personal knowledge, having herself been a victim. As to the effects of the fire, she stated:

> We [sic] first got out of the hospital we had a lot of people poking fun at us because we was in a house fire and everything. And, you know, we tried to deal with it, you know, and everything. And still –
>
> . . . .
>
> Still right now today people are still poking fun just like the prosecutor made a statement it's Burnt Face, you know. I mean, everybody know we're burnt, everybody can see that, but people just don't realize they're staring all the time and everything, you know. I real – I'd rather for them to ask questions instead.

Dr. Chiappone's testimony, which followed Pamela Campbell's, focused on his examination and analysis of Jerome Campbell. The psychologist met with Campbell only once, during which time he performed various tests and conducted a clinical interview concerning Campbell's personal history. According to Dr. Chiappone's testimony, he was able to explore Campbell's "family relationships, school situations, use of substances, legal history, vocational history, [and] relationships." As pointed out by Campbell in his habeas petition, however, this history did not include a review of Campbell's childhood medical records. When asked about the effect of the fire and subsequent hospitalization upon Campbell's development, Dr. Chiappone said:

> I think if you look at [the fire and hospitalization] from a psychological developmental standpoint it's important. He was approximately age four or five when this occurred. At that point in your life you're trying to get from your parents a sense of faith in the outside world.

> Unfortunately he was removed from the home and placed in the hospital. And so he didn't have that normal developmental path at least at that time.
>
> What he had was unfortunately injury [sic] where he was scarred and I believe he started to develop a sense of himself of being seen by others for his scars not himself. Not as his own person. And people reacted to him more for that. And not as a real person. And this was evident later on in life when he went to school especially.

Dr. Chiappone was also of the opinion that Campbell became alienated, a feeling that was exacerbated by the fact that Campbell got behind one year in school because of his hospitalization and because of the taunting he was subjected to by reason of his scars. When asked about his diagnosis, Dr. Chiappone concluded:

> It seems Mr. Campbell from a diagnostic perspective having what we call polysubstance abuse disorder meaning he's used numerous substances in the past. But also a character disorder we call personality disorder, call it a mixed type having two main features. The antisocial acting out style of behaving and also what we call narcissistic, meaning and [sic] overendorsed sense of importance and not willing to see his own limits.

He did not, however, find that Campbell suffers from PTSD. On cross-examination, in fact, Dr. Chiappone said that, according to Campbell, "his disfigurement was not of a concern to him."

In closing argument at the penalty phase, Campbell's attorneys contended that the facts of this case, as presented at the guilt phase, were not so severe as to warrant death. Further, with respect to the effect that Campbell's injuries should have in the jury's consideration of the mitigating circumstances, one of his attorneys argued as follows:

> This is an unusual circumstance when all you have to do is look right over there at the table you can see a lot of what this man's going through.