DECISION.
{¶ 1} In 1989, appellant Jerome Campbell was convicted and sentenced to death for the aggravated murder of Henry Turner. Campbell appealed his conviction to this court and to the Ohio Supreme Court, and it was affirmed by both courts. He petitioned twice for postconviction relief, and both times his petitions were denied. The United States District Court for the Southern District of Ohio denied Campbell's application for a writ of habeas corpus. That decision was affirmed on appeal to the Sixth Circuit Court of Appeals.
 {¶ 2} Campbell moved the trial court for a new trial based on newly discovered evidence under Crim.R. 33(A)(6). His motion was based on DNA test results and some police reports that the state had failed to provide to him at the time of his trial. The trial court denied his motion. We affirm.
 I. Trial Court's Denial of Campbell's Motion for a New Trial {¶ 3} The trial court correctly determined that the September 22, 2002, DNA test, which found that the blood on Campbell's gym shoes was consistent with Campbell's DNA and inconsistent with victim Henry Turner's DNA, was newly discovered evidence. The gym shoes belonged to Campbell and had been found by the police at Campbell's sister's apartment. At the time of his trial, the evidence had demonstrated only that the blood on the gym shoes was human blood; under the then-available testing, the results were inconclusive as to whether the DNA was consistent with either Campbell or Turner.
 {¶ 4} The trial court also properly concluded that police reports indicating that two jailhouse informants had lied when they testified that they had not sought favorable treatment for their testimony against Campbell were newly discovered evidence. Campbell obtained the police reports in February of 1999, following a discovery order in his federal habeas action. The police reports revealed, that contrary to their trial testimony, the state's two jailhouse informants Angelo Roseman and Ronys Clardy did receive consideration from the state for their testimony.
A. Police Reports Concerning Jailhouse Informants
 {¶ 5} The police report of March 27, 1989, concerning Roseman stated that after the officer received Roseman's statement, he contacted an assistant prosecutor, who listened to the taped recording of the statement. The report stated, "What we are going to try to do is to get [Roseman] out on bond on that [robbery] charge so that he can be free and don't [sic] have to worry about being locked up with Jerome Campbell. Get a continuance on his case when it comes up and try to work something out after he would testify in the Jerome Campbell trial."
 {¶ 6} Roseman was released on his own recognizance and received a continuance in his case, and after he testified, he received a lenient sentence. The report indicated that the state intended to "work something out" for Roseman after his testimony.
 {¶ 7} The March 17, 1989, report concerning Clardy indicated that Clardy was holding back information on Campbell's case because he wanted "some kind of a deal." The officers' plan was to put him in touch with the prosecutor's office to see what kind of arrangements could be made.
 {¶ 8} Clardy testified that his only motive for testifying against Campbell was that Campbell was evil, and he denied that he had discussed his case with law enforcement. The police report indicated that Clardy went to the police for the purpose of obtaining assistance with his case and was trying to work out a deal with the state in return for his testimony.
 {¶ 9} After he testified, Clardy's charges were dropped for want of prosecution. The assistant prosecutor on Clardy's case submitted an affidavit stating that he could not locate the victim. The transcript of the dismissal hearing quotes the assistant prosecutor as stating that "the police" could not locate the victim. The affidavit also indicated that it was "suggested" that other witnesses could not be found because the robbery was a drug deal gone bad. The state did not disclose any of this to Campbell and denied that any deals had been made.
 {¶ 10} Included in the new-trial motion was an affidavit from the victim of Clardy's crime indicating that he was, in fact, available, but was never contacted by the prosecution to testify. He averred that he had worked at the same place and had resided at the same address, and that his number was in the telephone book. He denied being involved in a drug deal and stated, in fact, that after the dismissal of the robbery charge against Campbell, he had served on a grand jury in Hamilton County.
B. DNA Results Indicating Campbell's Blood on His Gym Shoes
 {¶ 11} The trial court held that the discovery of the DNA test results and the police reports was not sufficient to justify a new trial for Campbell. In his sole assignment of error, Campbell now contends that the trial court abused its discretion in overruling his motion for a new trial. He argues that the new DNA evidence and the new evidence concerning the testimony of the two informants rendered his conviction unreliable.
 II. Standard of Review {¶ 12} A new trial may be granted on a defendant's motion when "new evidence material to the defense is discovered, which the defendant could not have discovered and produced at the trial." Whether to grant a new trial based on newly discovered evidence rests within the trial court's discretion.[1] A trial court abuses its discretion if the standards set forth in State v. Petro[2] are not satisfied.[3]
 {¶ 13} Before granting a motion for a new trial, the trial court must determine whether the defendant has demonstrated that the newly discovered evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."[4]
 {¶ 14} We must determine in this case whether the trial court abused its discretion by finding that the new evidence did not disclose that there was a strong probability that it would change the result if a new trial were granted. In order to do so, we have reviewed the record, including the original trial transcript and the pleadings concerning Campbell's motion for a new trial.
 III. The Evidence at Trial {¶ 15} The evidence demonstrates that at one time Campbell and Turner had lived in the same apartment building. The building had a common entrance. Turner had lived on the first floor, and Campbell had lived on the fourth floor. Turner sold half-pint bottles of liquor from his apartment. He would supply his customer's needs by filling empty half-pint bottles from larger bottles he kept in his apartment. Campbell had purchased whiskey from Turner in the past. Campbell had last been to the building on December 12, 1988, to retrieve some of his possessions.
 {¶ 16} Sometime between 7:30 p.m. on December 23 and 8:00 a.m. on December 24, 1988, Turner's apartment was ransacked and he was murdered. He bled to death from stab wounds. He had stab wounds to his chin, his left thumb, and his wrist, and two stab wounds to his upper chest. Turner's body was discovered lying on the landing leading to the neighbor's third-floor apartment on December 24, 1988.
 {¶ 17} Campbell's right index fingerprint was found on a light bulb on the floor in the common hallway outside Turner's kitchen door on December 24, 1988. The neighbor testified that the hallway light outside Turner's kitchen door was usually turned on every night, and that his doors were locked. The neighbor could not remember whether the light was on the night of the murder.
 {¶ 18} Campbell's left palm print was found directly above the lock of the hallway door leading into Turner's kitchen. The kitchen door had chisel marks around its lock. According to the upstairs neighbor, that door was "always fastened," but on the morning Turner's body was discovered, it had been pried open. The other door leading to Turner's apartment had had its casing splintered from being forcibly pushed open.
 {¶ 19} A neighbor recognized Campbell standing in the alley next to Turner's apartment building at 1:00 a.m. the morning of Turner's death. The lights from the building across the street illuminated the alley, and the neighbor walked within inches of Campbell. She recognized Campbell because he had lived in Turner's building recently, and because Campbell had a severely scarred face from burns that he had received as a child. She testified that she had seen Campbell 10 or 15 times before that evening. She walked by him, and looked at him, and they greeted each other. He appeared as if he were holding a bottle. Earlier in the evening, at approximately 11:00 p.m., she had seen what had appeared to be to a 12-year-old girl dressed in white jogging pants standing in the alley right by the side door. She twice called out the name of a relative. When the girl did not respond, she continued on.
 {¶ 20} Approximately a week after Turner's murder, the police found Campbell at his sister's apartment, where they arrested him. Campbell's sister gave her consent for her apartment to be searched. The police found an empty half-pint rum bottle with the sister's fingerprint on it underneath her bed. They removed from a closet a pair of white gym shoes belonging to Campbell, with the left rear heel cut out. One officer retrieved the shoes because he believed that they had bloodstains on them. Campbell said that he had cut off the heel because he had had a blister. The police photographed the blister on his heel.
 {¶ 21} The rum bottle found at the apartment of Campbell's sister and the one found at Turner's apartment were from the same batch of 339 bottles containing the same code number that had been shipped by the bottling company to the same distributor in Covington, Kentucky.
 {¶ 22} Estella Roe, Campbell's ex-girlfriend, testified that Campbell had told her during a telephone conversation that she needed to lie for him concerning Turner's murder by saying that he was with her the night of Turner's murder. According to Roe, Campbell initially had said that he was wanted for Turner's murder, but that he had not killed him. She told him that she wanted to know if that were the truth before she would lie for him. Campbell then said he had committed the murder. He later said that he had not. When she visited Campbell in jail, he informed her that he would write what she should say. She received a letter with instructions. The letter was later identified by a handwriting expert as containing Campbell's handwriting. Roe initially agreed to do as Campbell had asked. During a later visit, however, she told him that she had changed her mind about lying for him because she feared going to jail. She eventually gave the letter to law enforcement personnel.
 {¶ 23} Roe testified that the blood on Campbell's gym shoes was the result of her cutting his thumb during an altercation. She also testified that Campbell had told her that he had spent the night of the murder with a woman named Karen, which was what he had told the police during his interrogation. He also told her that Karen would not testify to that fact.
 {¶ 24} At trial, the state's witness, Denise Cargo, a serologist, testified that the right gym shoe was stained with human blood, although its type could not be determined.
 {¶ 25} Pamela Campbell testified that she had had a friend get her the half-pint bottle found under her bed from a "house joint in the area." She had received it on the Thursday before the murder and had no idea where her friend had purchased it. Campbell was asleep on her couch when she returned at 4:00 a.m. on December 24, 1988. Campbell's niece testified that Campbell had left his sister's house at approximately 11:00 p.m. on December 23, 1988. The evidence presented by Campbell was that the DNA test performed on the blood by Cellmark Laboratories was inconclusive.
IV. Jailhouse Informants' Favorable Treatment Fails to Establish aStrong Probability of Acquittal If New Trial Granted
 {¶ 26} We must determine whether evidence that Clary and Roseman had received favorable treatment because of their testimony established a strong probability of a different result in a new trial. Clardy's testimony was that Campbell had entered Turner's kitchen door, using a nail puller to get in. Campbell picked up a knife from Turner's kitchen. He accidentally awakened Turner. Campbell asked Turner where he kept his money. When Turner grabbed for his gun, Campbell stabbed him in the stomach, and his throat, and cut his wrists. (This was inconsistent with the actual stab wounds.) Campbell had also told Clardy that he was concerned because a woman had seen him standing outside Turner's building.
 {¶ 27} Roseman testified that Campbell had told him that he went to Turner's apartment to rob him. And that once he was there, he had to kill Turner. Campbell expressed concern about a girl saying that she had seen him. Both informants knew things that only the murderer could have known, which added weight to their testimony.
 {¶ 28} The Sixth Circuit examined the effect of Clardy's and Roseman's testimony under the standard for granting habeas corpus relief whether there is a reasonable probability [our standard is strong probability] that had the evidence been disclosed to the defense, the results of the proceeding would have been different.[5] It agreed with the district court that there was no reasonable likelihood that the allegedly false testimony could have affected the jury's judgment."[6]
It also noted, "Campbell's charge of falsity is considerably diminished by the fact that both Clardy and Roseman independently recalled specific details concerning the murder * * * details they would not have known about unless told by Campbell."[7] And, last, it agreed with the district court that the evidence of Campbell's guilt was so overwhelming that "there was no reasonable probability that Campbell would have been acquitted."[8]
 {¶ 29} In this case, Campbell argued before the trial court in his motion for a new trial that the Sixth Circuit did not have the opportunity to consider the false testimony in addition to the new DNA evidence. We consider that below after we review the effect of the DNA evidence.
V. DNA Evidence Fails to Establish a Strong Probability of Acquittalif a New Trial Granted.
 {¶ 30} The newly discovered DNA evidence showed that the blood on the shoes was consistent with Campbell's DNA profile and inconsistent with Turner's DNA profile. Thus, Turner was excluded as a source of the DNA from the blood stains on the shoe.
 {¶ 31} The trial transcript demonstrates that the state did want the jury to infer that the blood was the victim's. Before trial, its attempt to display the gym shoes before they had been admitted into evidence was thwarted by defense counsel's suggestion that the assistant prosecutors put the shoes into the evidence bags from which they had been taken. The gym shoes were entered into evidence through Detective Ronald Camden's testimony that he had taken the shoes because they appeared to have blood on them.
 {¶ 32} When Roe testified that Campbell had bled on his shoes following their altercation, the state attempted to imply that the bloodstains were not necessarily from that incident that the blood was from a more recent time.
 {¶ 33} While it is obvious that the state wanted the jury to believe that the blood on the gym shoes was Turner s, even if a jury were presented with evidence that it was Campbell's blood on the shoe, we agree with the trial court that there is not a strong probability that a new trial would result in an acquittal.
VI. The Combination of the Newly Discovered Evidence Does NotNecessitate a New Trial
 {¶ 34} Even considering all the newly discovered evidence together, we conclude that the record places Campbell at the scene on the night of the murder; his fingerprint was found on a light bulb that had been removed from its socket; and his palm print was found above the lock of a door to Turner's apartment that had been pried open. Further, Campbell told his ex-girlfriend that he had committed the murder and provided her with detailed instructions on how to lie for him. And two witnesses testified that he had confessed to the murder, and they related details that only the murderer would have known. Accordingly, we conclude that the trial court did not abuse its discretion in denying Campbell's motion for a new trial, and its judgment is, therefore, affirmed.
Judgment affirmed.
Sundermann, P.J., and Gorman, J., concur.
[1] See State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128,767 N.E.2d 166, ¶ 85.
[2] State v. Petro (1947), 148 Ohio St. 505, 76 N.E.2d 370.
[3] See State v. Hawkins (1993), 66 Ohio St.3d 339, 350,612 N.E.2d 1227.
[4] State v. Petro, 148 Ohio St. at 505, syllabus.
[5] See Campbell v. Coyle (C.A.6, 2001), 260 F.3d 531, 559, quotingKyles v. Whitley (1995), 514 U.S. 419, 433, 115 S.Ct. 1555.
[6] Id.
[7] Id.
[8] Id.