NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0553n.06

No. 14-4002

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOSEPH REDDY, | ) | **FILED**<br>Sep 28, 2016<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| BENNIE KELLY, Warden, | ) | DISTRICT OF OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

**BEFORE:  BOGGS, WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  After a bench trial, Joseph Reddy was convicted of the aggravated murder of his mother, Gloria Reddy, in Ohio state court.  At sentencing, Reddy's attorney asked the court to consider evidence that Reddy suffered from post-traumatic stress disorder (PTSD), which had not been introduced at trial.  Reddy appealed his conviction, arguing that the evidence was insufficient to support aggravated murder, and that counsel was ineffective for not introducing the PTSD evidence at trial ("IAC/PTSD claim").  The Ohio appellate court modified Reddy's conviction from aggravated murder to murder, but did not address the IAC/PTSD claim.  Reddy then brought this petition for federal habeas relief on ineffective-assistance grounds, and the district court denied the petition.

Because the state court did not adjudicate Reddy's IAC/PTSD claim on the merits, we review de novo.  We conclude that Reddy received ineffective assistance, and accordingly, **REVERSE** the judgment of the district court, **CONDITIONALLY GRANT** Reddy's habeas petition, and **REMAND** to the district court with instructions to order Reddy's release from

custody unless the state grants a new trial within 180 days from the date that the mandate issues from this court.

## I. Background

### A. Facts

The Ohio Court of Appeals set forth the relevant facts:

> Reddy had a troubled relationship with his mother, Gloria. In a statement to police, Reddy stated that when he was 14 years old, he was removed from Gloria's care after she physically assaulted him. He was placed in a group home, where he lived for four years. When Reddy turned 18 years old, he left the group home and moved in with his girlfriend, Michelle Dahlberg. He lived with Dahlberg until January 2007, when he and Dahlberg ended their relationship. Reddy, 21 years old, moved in with his mother, who lived in a multifamily house located at 1432 West 112th Street, Cleveland, Ohio, where his 17–year–old brother, Andrew, also lived.

> Reddy further stated that Gloria suffered from mental illness, as well as drug and alcohol problems, and she became increasingly violent toward Reddy and Andrew. On July 26, 2007, due to the fact that Gloria was in jail and there had been increasing discontent and violence in the home, Andrew moved out and went to live with a neighbor, Donna Amato, who lived a few houses down, at 1422 West 112th Street, in Cleveland, Ohio. According to Amato, she took Andrew into her home after he arrived at her son's birthday party bruised and bloodied and stated that Reddy had physically assaulted him.

> On December 24, 2007, at approximately 4:00 a.m., according to the statement Reddy gave to police, Gloria came into his bedroom and told him that he had to leave the house. Reddy refused to leave because it was Christmas Eve and he had nowhere to go. He alleged that the argument escalated and Gloria went to her bedroom and returned with a dagger, pushed Reddy's bedroom door in, and threatened to kill him. Reddy punched Gloria in the face several times, tackled her to the ground, and then choked her until she stopped moving. Reddy maintained that the entire event occurred in his bedroom.

> Reddy wrapped Gloria's body in a blanket, placed it in a basement storage locker, took Gloria's ATM card, and left the house. Reddy used the ATM card several times to withdraw cash from an ATM machine at Fred's Deli, located at 11119 Detroit Avenue, in Cleveland.

> On December 31, 2007, Andrew contacted his uncle, Theodore Reddy ("Theodore"), and informed him that he could not find Gloria. The following day, Theodore met Andrew outside Gloria's house. The two entered together and walked throughout the house looking for Gloria, but did not find her.

On January 2, 2008, Theodore met Andrew again at Gloria's house. After they were still unable to find her, Theodore contacted the Cleveland police. Lieutenant James Plent responded to the call and arrived at Gloria's house. Plent stated that he noticed bloodstains on the walls, and Andrew informed him that the key to the basement storage area was missing.

Plent believed that Gloria's body could have been in the basement storage area. Theodore kicked in the locked door to the basement storage area. Plent entered the storage area and discovered Gloria's body, at which point he contacted the homicide unit.

On January 9, 2008, Reddy arrived at the house of Jason Pagan ("Jason"), appearing dirty and distraught. Reddy confessed to Jason's brother, Jonathan Pagan ("Jonathan"), that he had killed his mother during an argument before Christmas. Reddy showed the brothers a dagger he had brought with him and made several references to going to Dahlberg's residence to give her and her boyfriend a "Christmas present."

Fearing that Reddy might harm Dahlberg, Jonathan called police as soon as Reddy left and told them that Dahlberg might be in danger. Cleveland police officers responded to Dahlberg's residence. When Dahlberg did not answer the door, Cleveland police officer Robert Nagy entered the residence through a window. Several other officers subsequently entered, and Reddy was apprehended in the basement.

*State v. Reddy*, 948 N.E.2d 454, 458–59 (Ohio Ct. App. 2010).

**B. Trial and conviction**

An Ohio grand jury indictment charged Reddy with one count of aggravated murder, in violation of Ohio Rev. Code § 2903.01. Aggravated murder is one of three homicide offenses at issue in this case: aggravated murder, murder, and voluntary manslaughter. As relevant here, Ohio defines the crime of murder as "purposely caus[ing] the death of another," Ohio Rev. Code § 2903.02(A), while aggravated murder requires additional proof that the defendant acted "with prior calculation and design." *Id.* § 2903.01(A). A defendant tried for either crime may produce mitigating evidence to obtain an instruction on voluntary manslaughter, an "inferior degree of murder." *State v. Rhodes*, 590 N.E.2d 261, 264 (Ohio 1992). Voluntary manslaughter is defined as "knowingly caus[ing] the death of another" while "under the influence of sudden passion or in

a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." Ohio Rev. Code § 2903.03(A).

Reddy waived his right to trial by jury, and the case was tried to the bench in the Court of Common Pleas over two days in February 2009. At trial, there was no dispute that Reddy killed his mother. Reddy's counsel, Harvey Bruner, opened by conceding that Reddy had committed a homicide offense but asked the court to find Reddy "guilty of something less than aggravated murder." R. 5-5, PID 175–76. Thus, the state focused its case on demonstrating the "prior calculation and design" required for an aggravated murder conviction. Prosecutors called seventeen witnesses: Reddy's friends, family, and neighbors testified about his relationship with his mother, including purported threats Reddy had made; the coroner testified about the condition of Gloria Reddy's body, including extensive bruising around her head indicating blunt force trauma; and investigators testified about the crime scene—including the bloodstains on walls in three rooms of the house—as well as Reddy's statement to police. During cross-examination, Bruner adduced testimony from the state's witnesses about Gloria Reddy's abusive treatment of Reddy.

At the close of the state's evidence, Bruner moved to acquit on the aggravated murder charge, arguing that the evidence was insufficient to support prior calculation and design. Bruner asserted that it was "for the Court to decide whether or not a straight murder is appropriate or under the circumstances possibly manslaughter is appropriate, but certainly prior calculation and design was not proven beyond a reasonable doubt by the State," leading to the following colloquy with the trial court:

|              |                                                                                                                                                                                                                                                                                                              |
| ------------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
| THE COURT:   | Am I hearing you say that if we were in front of a jury you would be asking the Court for a voluntary manslaughter charge?                                                                                                                                                                                    |
| MR. BRUNER:  | Probably, Your Honor, yes, you are.                                                                                                                                                                                                                                                                         |
| THE COURT:   | Well, you would actually be saying since the jury might find all the elements of aggravated murder except prior calculation and design you should instruct on murder, and since there is evidence supporting the emotional element, that the jury should be charged on the inferior offense of voluntary manslaughter. Wouldn't that be the analysis? |
| MR. BRUNER:  | Certainly, Your Honor, under the circumstances in view of the evidence in this case, that would be the analysis. I would certainly ask for a voluntary manslaughter charge as well as the murder charge.                                                                                                       |
| THE COURT:   | I mean, that's my whole point. You don't go from agg murder to voluntary.                                                                                                                                                                                                                                    |
| MR. BRUNER:  | That's why I'm asking the Court to dismiss the aggravated murder charge at this point.                                                                                                                                                                                                                       |

*Id.* at PID 903–04.

The trial court denied the motion to acquit on aggravated murder, concluding that there was evidence to support prior calculation and design, and Bruner rested the defense without calling additional witnesses. In closing, Bruner argued that the state had not proven prior calculation and design, and that the question for the court was "more an issue between murder and manslaughter, voluntary manslaughter." R. 5-8, PID 933. "You don't kill your mother under any circumstances," Bruner told the court, "but under these circumstances [Reddy] was acting in a fit of rage, it was brought on by serious provocation." *Id.* Bruner asked the court "to find [Reddy] guilty of voluntary manslaughter." *Id.* at PID 934.

The trial court found Reddy guilty of aggravated murder, explaining:

The trouble the Court has in interpreting this evidence as being something other than prior calculation and design stems from the physical damage to the

victim and the presence of blood splattering, not only in Joseph Reddy's bedroom, but also in both walls of the hallway walls [sic], as well as the living room. . . .

The defendant's rendition of what happened never mentions any of the head injuries and when you combine the evidence of the head injuries and all those blood splatters, it strikes the Court as consistent with the beating of the victim as having occurred prior to any choking, so the pattern the evidence presents to the Court and of which I'm convinced beyond a reasonable doubt is whatever the victim may have done to incite or enrage her assailant, Mr. Reddy, the plain fact of the matter is that the sequence of events had to have occurred with the beating of the victim's head in rooms—in various rooms, hallway, living room, Joseph's bedroom. And that had to have been—that had to be preceded by her choking. . . .

So all of the evidence to this Court points in the direction of a purposeful killing, and not a killing that is in reaction to an assault instigated by the victim, even though she may have, in fact, instigated it with a knife or some other objects in the course of this argument, but the circumstances of the body and the physical evidence both on the decedent's body as well as the blood and the other surrounding evidence indicates that she was attacked in numerous locations, and only after that she was strangled and died.

So the Court is convinced beyond a reasonable doubt this defendant is guilty of aggravated murder as charged in count 1.

*Id.* at PID 946–48.

Before adjourning, the trial court scheduled sentencing, and Bruner asked that the court review a report authored by Dr. John Fabian, a forensic and clinical psychologist, before sentencing. Bruner had retained Dr. Fabian before trial to assess Reddy's psychological and psychiatric state at the time of the offense as part of an investigation into Reddy's competency to stand trial. However, the parties subsequently stipulated to competency after the court reviewed two separate evaluations conducted by doctors at the court's psychiatric clinic, one of which was at Bruner's request. During the competency hearings, Bruner mentioned that he had retained Dr. Fabian, but did not discuss the contents of Dr. Fabian's report.

In the report, Dr. Fabian explains that, among other things, he administered the Detailed Assessment of Posttraumatic Stress (DAPS) "to assess for posttraumatic stress disorder

symptoms." R. 7-3, PID 1714. Reddy "scored in the clinically significant range for significant emotion [sic] or cognitive distress at the time of the traumatic event and posttraumatic symptomatology based on his traumatic event," namely "the significant and consistent abuse by his mother." *Id.* Dr. Fabian diagnoses Reddy with "Posttraumatic Stress Disorder, provisional." *Id.* at PID 1715. He explains: "I . . . believe [Reddy] has qualified for Posttraumatic Stress Disorder. He reports a significant history of abuse and based on interview and psychological testing, he presents as qualifying for many of the symptoms of PTSD." *Id.* The report concludes: "It is my opinion, with reasonable psychological certainty, that Mr. Joseph Reddy is a mentally ill individual. He qualifies for Major Depression, Posttraumatic Stress Disorder, Cannabis Abuse or Dependence and Borderline and Antisocial Personality Disorder." *Id.* at PID 1717. Further, Dr. Fabian explains that "there is a nexus between Mr. Reddy's mental illness, his abusive history with his mother, and his homicidal behavior." *Id.* at PID 1718.

Bruner provided Dr. Fabian's report to the court shortly after the announcement of the verdict. The court did not address Dr. Fabian's report at sentencing, other than acknowledging having "reviewed" it. R. 5-8, PID 954. The court imposed a sentence of 20 years to life imprisonment and appointed new counsel, James Valentine, to handle the appeal.

### C. Direct appeals

Reddy appealed his conviction to the Ohio Court of Appeals, filing his principal brief through counsel and a separate pro se supplemental brief. In the principal brief, counsel argued that the evidence was insufficient to support the aggravated-murder conviction, among other issues. In the pro se brief, Reddy raised seven assignments of error, including an argument that trial counsel was ineffective in failing to "present relevant and available psychiatric testimony" regarding Reddy's "state of mind," specifically Dr. Fabian's diagnosis of "PTSD stemming from physical childhood abuse." R. 5-18, PID 1166–68. Reddy asserted that the "only issue at trial

was the *mens rea*," and the only "plausible line of defense in this type of case" was "to present psychiatric testimony." *Id.* at PID 1167.

The Ohio Court of Appeals issued its decision in *State v. Reddy*, No. 92924, 2010 WL 3351428 (Ohio Ct. App. Aug. 26, 2010), but later granted reconsideration and issued a superseding opinion in *State v. Reddy*, 948 N.E.2d 454 (Ohio Ct. App. 2010). In the decision on reconsideration, the court of appeals agreed that the evidence presented at trial was insufficient to support that Reddy acted with prior calculation and design:

> In the instant case, there was no evidence to suggest that Reddy had planned to kill his mother. In fact, the only evidence presented at trial indicates that it was a spontaneous act that occurred during yet another argument between Reddy and Gloria. It was Gloria who confronted Reddy in his bedroom. This is in sharp contrast to [a case where the defendant] sought out the victims.
>
> Detective Ignatius Sowa of the Cleveland Police Department testified that he interviewed Gloria's neighbor, Alecia Hughley, shortly after the discovery of Gloria's body. Hughley told Sowa that she had heard Reddy and Gloria arguing shortly before Gloria disappeared and, specifically, that she heard Reddy yelling at Gloria to put her knife down.
>
> Numerous witnesses testified that Reddy and his mother had a troubled relationship and that Reddy had been physically and verbally abused by his mother for years. These facts support Reddy's contention that he did not plan to kill his mother and that she was killed during an instantaneous eruption of events. Reddy's uncle, Theodore, as well as his two longtime friends, Jonathan and Jason Pagan, all testified that Reddy told them that Gloria came into his bedroom with a knife and threatened him.

*Reddy*, 948 N.E.2d at 461–62. The court of appeals specifically rejected the trial court's reliance on evidence of blood stains on the walls of the house:

> In concluding that Reddy's attack on Gloria was a drawn-out event, the trial court relied heavily on pictures that depicted blood throughout the house. The trial court stated that blood was present not only in Reddy's room, where he alleges the incident took place, but also in the hallways and living room. However, there was no testing performed on the alleged blood stains to determine whether the substance was in fact blood and, if so, whose blood it was and how long the blood had been there. There is evidence of a history of violent behavior

in the home, and the blood depicted in the photographs could have been there from prior physical violence.

Gloria had been increasingly violent with Andrew during the last year of her life. Andrew testified to numerous instances of violence within the home. He stated that his mother chased him with a hammer and, on one occasion, bruised his rib. Andrew also stated that shortly before he moved out of Gloria's house to live with his neighbor, Amato, Reddy punched his fist into one of the walls, drawing blood. Thus, the blood could have come from any one of the individuals in the house, during one of the numerous instances of violence within the house. We find that the trial court erred in relying exclusively on the presence of blood throughout the home as the critical factor in determining that there was prior calculation and design.

*Id.* at 460–61.

Although the evidence was insufficient to convict Reddy of aggravated murder, the court of appeals concluded that the evidence supported a murder charge, and modified his conviction to find him guilty of murder rather than ordering a new trial. *Id.* at 462. The court of appeals did not address lesser-included or inferior-degree offenses other than murder when modifying the conviction. *See id.* However, Reddy's pro se brief separately raised the question whether the trial court abused its discretion by "refusing to consider [a] lesser degree of homicide" and "committed reversible error by failing to consider convicting him of voluntary manslaughter." *Id.* at 468. The court of appeals overruled the assignment of error, having "already found that the evidence in the record, while insufficient for aggravated murder, was sufficient to convict Reddy of murder," based on the presumption that "the trial court considered all lesser and included offenses as well as inferior degree offenses, unless the record shows otherwise." *Id.*

The court of appeals also addressed Reddy's separate pro se assignments of error on ineffective-assistance grounds. In response to Reddy's claim that trial counsel was ineffective for failing to present evidence of PTSD, the court of appeals wrote:

Reddy also argues that trial counsel was ineffective in failing to present evidence that Gloria had abused him as a child. However, a review of the record

indicates that that is not accurate. The past abuse Reddy suffered was the crux of his defense. In closing argument, Reddy's counsel stated:

> How could there be any question after all of the people that testified, his girlfriend, Rachel, was the first one, [then] Michelle Dahlberg, and Donna Amato * * * [H]ow could the court believe anything other than the fact that this woman abused her children. * * * Can there be any doubt that after years of abuse, on Christmas Eve when he was attacked by his mother under the influence of sudden passion or a fit of rage, he fought back and attacked her?

> From the record, it is clear that trial counsel placed considerable emphasis on the fact that Gloria had abused Reddy.

*Id.* at 467. Reddy's other assignments of error, both pro se and through counsel, were rejected or held moot, and the court of appeals remanded for resentencing in light of the modified conviction. *Id.* at 468.

Reddy appealed the initial decision of the Ohio Court of Appeals, moved to withdraw the appeal after the Ohio Court of Appeals granted reconsideration, and then appealed the decision on reconsideration. Reddy's memoranda in support of jurisdiction claimed, among other things, that counsel was ineffective for failing to present psychiatric testimony. The Ohio Supreme Court denied leave to appeal and denied the motion to withdraw as moot. *State v. Reddy*, 942 N.E.2d 386 (Ohio 2011) (table); *State v. Reddy*, 939 N.E.2d 1267 (Ohio 2011) (table). Reddy also filed an application in the Ohio Court of Appeals for reconsideration of the decision on reconsideration, arguing that appellate counsel had been ineffective for failing to argue that the case should be remanded for a new trial rather than modification of the conviction. *State v. Reddy*, 2011 WL 1744528, at *1 (Ohio Ct. App. May 3, 2011). The court of appeals concluded that the application was time barred, and would have been barred by res judicata in any event because the court had already considered and denied a new trial, which Reddy had sought in his pro se supplemental brief during the earlier proceeding. *Id.* at *1–2.

**D. Proceedings on remand**

The trial court held a resentencing hearing where Reddy was represented by Valentine, his appellate attorney. Valentine acknowledged that given the appellate court's ruling modifying Reddy's conviction to murder, there was "only one potential penalty," but inquired whether Dr. Fabian's report had been entered into the record for purposes of a later collateral challenge. R. 5-9, PID 983. The trial court was unsure.

Valentine provided a copy of Dr. Fabian's report, which the trial court reviewed from the bench. Valentine drew the court's attention to Dr. Fabian's conclusions, quoting the passage that identified "a nexus between Mr. Reddy's mental illness, his abusive history with his mother, and his homicidal behavior." *Id.* at PID 986. The court remarked:

> Well, the court has had an opportunity now to review this very thorough report and I agree with your quotation. The last sentence does read that way. And I agree that Dr. Fabian spends a great deal of this evaluation supporting that conclusion, the fact and having been trier of the facts in Mr. Reddy's trial [sic], I don't think there is a lot of issue to take with that. . . .

> [I]t does say to a reasonable medical certainty Mr. Reddy is a mentally ill individual with major depression, post-traumatic stress disorder, abuse and/or dependence upon marijuana and borderline anti-social personality disorder features.

> Sadly, it would appear to the court that Dr. Fabian attributes the cause of Mr. Reddy's diagnosis as being the very sad childhood that he experienced at the hands of his mother.

*Id.* at PID 986–87. The trial court marked the report as a defense exhibit and entered it on the record, noting: "Let me just state that even though that appears to have been prepared for trial, I don't believe that that was put into evidence at the trial. I don't think that was touched on in any way." *Id.* at PID 988. Valentine agreed that "it wasn't in the actual trial." *Id.* The trial court remarked that the report "was not shared with the court at the time of sentencing. I think I would recollect that." *Id.* After Reddy pointed out that the trial court had acknowledged reviewing the

report at sentencing, which had taken place more than a year earlier, the trial court explained: "I really—I don't remember that at all, but then that's the way my memory can be." *Id.*

Returning to the issue of sentencing, Reddy acknowledged that he could only be sentenced to 15 years to life imprisonment on a murder charge. However, he also raised the issue of voluntary manslaughter:

> But if you recall in the trial motion, Criminal Rule 29 motion for acquittal when I was facing aggravated murder with prior calculation and design, we asked you, your Honor, if you could acquit of the mens rea prior calculation and design and amend it to murder and that from the murder we would be able to present the mitigation circumstances for voluntary manslaughter. And you said, quote, if there was a jury in here, then you would be asking for a manslaughter instruction. You said [sic] yes, yes, your Honor, I certainly would. You said, well that's the whole point. You don't go from aggravated murder to manslaughter. I wasn't able to really go from aggravated murder to manslaughter because of the aggravated murder.
>
> Well, now, the Court of Appeals decided that I should not have the aggravated murder with prior calculation and design, but they are not going to give me a new trial, so I am precluded from ever arguing manslaughter and having a meaningful consideration of it.

*Id.* at PID 997. The trial court responded:

> I do understand the legal problem that you are pointing out to the court, that if you as a defendant go forward with evidence tending to show that the killing occurred in a sudden fit of rage provoked by your victim, et cetera, that whether you are found guilty of murder or not guilty of murder, the court has to go on, the trier of fact has to go on to consider that. Yes.
>
> By the court rejecting the argument that it was murder as opposed to aggravated murder, you were prevented from going on to what's called an inferior offense, going on to talk about the inferior offense, the voluntary manslaughter.

*Id.* at PID 998–99. The trial court went on to explain that the appellate court's mandate had been limited to resentencing on a murder charge. Thus, the trial court found Reddy guilty of murder, in violation of Ohio Rev. Code § 2903.02(A), and imposed a sentence of life imprisonment with parole eligibility after 15 years.

Reddy appealed from the newly entered murder conviction, arguing that trial counsel had been ineffective for failing "to present psychiatric testimony regarding [Reddy's] mental state and/or perception of danger based on the diagnosis of post-traumatic stress disorder," among other claims. R. 5-48, PID 1542. The Ohio Court of Appeals concluded that Reddy's claims had "previously been considered or could have been considered" in the court's earlier decisions, and were therefore "barred by the doctrine of res judicata." *State v. Reddy*, No. 95814, 2011 WL 2436596, at *3 (Ohio Ct. App. June 16, 2011). Reddy appealed, again raising the PTSD issue, R. 5-63, Mem., PID 1686, but the Ohio Supreme Court denied leave to appeal. *State v. Reddy*, 955 N.E.2d 387 (Ohio 2011) (table).

**E. Postconviction review**

While the direct appeals were pending, Reddy filed a petition for postconviction relief in the Court of Common Pleas, pursuant to Ohio Rev. Code § 2953.21. The trial court granted the state's motion for summary judgment and denied postconviction relief without a hearing, concluding that Reddy's claims were barred by res judicata because he had not presented "competent, relevant, and material evidence outside the record that was not in existence and available to [Reddy] in time to support the direct appeal." R. 5-36, PID 1490–91 (citing *State v. Lawson*, 659 N.E.2d 362 (Ohio Ct. App. 1995)). Reddy appealed, but the Ohio Court of Appeals dismissed the appeal sua sponte for failure to file the state-court record, pursuant to Ohio Rules of Appellate Procedure 3(A) and 10(A). After Reddy had been resentenced for murder, he moved for leave to amend his postconviction petition in the Court of Common Pleas. The court denied the motion on the ground that the petition had already been denied, leaving nothing to amend.

Reddy filed the instant petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio in January 2010. Among several grounds for relief,

Reddy argued that trial counsel had been ineffective for failing to present PTSD evidence. The magistrate judge recommended denial. Reddy objected, but the district court overruled his objections, adopted the magistrate judge's recommendation, dismissed the petition, and denied a certificate of appealability. Reddy timely appealed, and we issued a certificate of appealability limited to the question whether Reddy's "trial attorney was ineffective for not presenting evidence that Reddy suffered from PTSD." R. 18, PID 1857.

## II. Standard of review

We review de novo the district court's denial of Reddy's habeas petition, *Barton v. Warden*, 786 F.3d 450, 460 (6th Cir. 2015) (per curiam), and our review of Reddy's state-court conviction is governed by the deferential standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214.

Where a state prisoner's claim was "adjudicated on the merits" in state court, AEDPA bars relitigation of the claim in federal court unless the state-court adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in § 2254(d)(1) and (2)."). However, where a claim was fairly presented to the state courts but not "adjudicated on the merits," the claim is "given plenary review by a federal habeas court." *Jackson v. Smith*, 745 F.3d 206, 209 (6th Cir. 2014); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated on the merits in State court.'"); *Jackson v. Houk*, 687 F.3d 723, 731 (6th Cir. 2012) ("[W]hen a

claim has not been adjudicated on the merits in State court proceedings, and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA.") (citing *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)).

The Supreme Court has explained that federal habeas courts must "presume[] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption "is a strong one that may be rebutted only in unusual circumstances," *Williams*, 133 S. Ct. at 1096, but "may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100. For example, "[i]f a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter." *Williams*, 133 S. Ct. at 1097. Further, we have concluded that a claim was not adjudicated on the merits where a state court "misconstrued" and "did not reach the core" of a fairly presented argument. *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012); *see also Jells v. Mitchell*, 538 F.3d 478, 505 (6th Cir. 2008). This assessment is based on the "language used by the state court in its discussion of the claim at issue and the context of that discussion." *Barton*, 786 F.3d at 460.

We conclude that the Ohio Court of Appeals, the highest state court to consider Reddy's PTSD claim, did not adjudicate his claim on the merits. On appeal from the aggravated murder conviction, Reddy argued that "Appellant received ineffective assistance of counsel when counsel failed to present relevant and available psychiatric testimony regarding Appellant's state of mind and of mental illness[,] specifically post-traumatic stress disorder." R. 5-18, PID 1166. In the decision on reconsideration, the Ohio Court of Appeals clearly misconstrued this claim: "Reddy also argues that trial counsel was ineffective in failing to present evidence that Gloria

had abused him as a child." *Reddy*, 948 N.E.2d at 467. Reddy did not argue that Bruner failed to present evidence of abuse; he argued that Bruner failed to present psychiatric of evidence of PTSD, which is meaningfully different. In explaining its denial of relief, the court of appeals focused exclusively on the question whether Bruner had presented evidence of abuse, and did not address psychiatric evidence. *See id.* Reddy raised his PTSD claim again on appeal from his modified conviction of murder, but the Ohio Court of Appeals denied relief, relying on its earlier decision in the appeal from the aggravated murder conviction. *Reddy*, 2011 WL 2435696, at *2–3.

Thus, although the Ohio Court of Appeals purported to address Reddy's claim, it "did not reach the core" of the argument, *Campbell*, 674 F.3d at 596, perhaps out of "sheer inadvertence." *Williams*, 133 S. Ct. at 1097. This case presents "the unusual circumstances" where the presumption of adjudication is rebutted, *id.* at 1096, because "there is reason to think some other explanation for the state court's decision is more likely"—namely, that the decision of the Ohio Court of Appeals misconstrued the claim and addressed a different argument. *Richter*, 562 U.S. at 99–100. We therefore review Reddy's ineffective-assistance claim de novo.

### III. Discussion

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

#### A. Performance

To establish deficient performance, Reddy "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Then, we "must determine whether, in light of all the

circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Specifically, Reddy "must show that counsel's representation fell below an objective standard of reasonableness" where reasonableness is assessed "under prevailing professional norms." *Id.* at 689. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that "under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

Reddy argues that Bruner's performance was deficient because he failed to present evidence that Reddy suffered from PTSD. As the Ohio Court of Appeals explained, "trial counsel's entire trial strategy" was based on demonstrating voluntary manslaughter, *Reddy*, 948 N.E.2d at 467, which required proof that Reddy acted "under the influence of sudden passion or in a sudden fit of rage," brought on "by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." Ohio Rev. Code § 2903.03(A). Because a defendant on trial for murder bears the burden of establishing the mitigating circumstances necessary to show voluntary manslaughter, *Rhodes*, 590 N.E.2d at 264, Bruner's trial strategy evidently was to adduce testimony to support that Gloria Reddy had sufficiently provoked Reddy, and that Reddy was under the influence of a sudden passion or fit of rage when he killed her.

Bruner obtained Dr. Fabian's report evaluating Reddy's psychiatric condition before trial. In the report, Dr. Fabian wrote that his administration of the DAPS—the PTSD assessment—revealed that Reddy "scored in the clinically significant range for significant emotion or cognitive distress at the time of the traumatic event and posttraumatic symptomatology based on his traumatic event." R. 7-3, PID 1714. Dr. Fabian noted that Reddy "reported significant hyperarousal" and "irritability or outbursts of anger" associated with "a significant history of

abuse," and provisionally diagnosed Reddy with PTSD, explaining that Reddy "presents as qualifying for many symptoms of PTSD" and "qualified for Posttraumatic Stress Disorder." *Id.* at PID 1714–16. Further, Dr. Fabian asserted that there was "a nexus between Mr. Reddy's mental illness, his abusive history with his mother, and his homicidal behavior." *Id.* at PID 1717–18. When the state trial court reviewed the report at resentencing, the court noted that Dr. Fabian concluded to "a reasonable medical certainty [that] Mr. Reddy is a mentally ill individual with . . . post-traumatic stress disorder." R. 5-9, PID 987.

Despite obtaining this report, Bruner offered no evidence of PTSD—or any psychiatric evidence—at trial. Evidence of PTSD would have been vital to Reddy's defense. As amicus curiae, the National Association of Criminal Defense Lawyers, explain, PTSD is a mental illness listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5"). According to the DSM-5, the diagnostic criteria for PTSD include "[m]arked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by," *inter alia*, "[i]rritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects," "[r]eckless or self-destructive behavior," "[h]ypervigilance," and "[e]xaggerated startle response." App'x at 4. Further, "PTSD is often characterized by a heightened sensitivity to potential threats, including those that are related to the traumatic experience," and "[i]ndividuals with PTSD may be quick tempered and may even engage in aggressive verbal and/or physical behavior with little or no provocation (e.g., yelling at people, getting into fights, destroying objects)." App'x at 7. Lastly, the DSM-5 notes that "[f]ollowing prolonged, repeated, and severe traumatic events," including "childhood abuse," a person suffering from PTSD "may additionally experience difficulties in regulating

emotions or maintaining stable interpersonal relationships, or dissociative symptoms." App'x at 8. Here, Dr. Fabian's report linked Reddy's PTSD diagnosis to the childhood abuse by his mother.

The record establishes that Bruner's decision not to present PTSD evidence was not sound trial strategy. Bruner was clearly aware of Reddy's PTSD diagnosis; he obtained Dr. Fabian's report before trial, and brought it to the court's attention immediately after the court announced its verdict. It is also clear that Bruner thought Dr. Fabian's report was important; he raised the issue unprompted. Further, Bruner would have asked the court to review Dr. Fabian's report for sentencing purposes only if he believed it was favorable to Reddy and supported a more lenient sentence. Given the defense that Bruner chose to pursue, there could be no reasonable strategy in presenting PTSD evidence at sentencing and not at trial, especially given that the same finder of fact—the state trial court—determined both guilt and the sentence. Although we must "indulge a strong presumption" that Bruner's conduct fell "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 690, we conclude that Bruner's decision not to present PTSD evidence at trial falls below an objective standard of reasonableness in light of the unusual factual circumstances presented by this case.

These unusual circumstances—Bruner's failure to present known, persuasive PTSD evidence in support of his express trial strategy—distinguish this case from other decisions denying relief where trial counsel failed to present PTSD evidence. For example, in *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001), a habeas petitioner claimed trial counsel was ineffective for "failing to discover and present" evidence of "possible" PTSD during the guilt and penalty phases of his trial, arguing that his childhood medical records should have alerted counsel to a possible PTSD diagnosis. *Id.* at 546. We concluded that the state court's decision denying relief

was not unreasonable, in part because the petitioner had "never been diagnosed or treated for PTSD," and could not point to medical evidence that he had PTSD. *Id.* at 555. Further, counsel had obtained an evaluation from a clinical psychologist who did not diagnose the petitioner with PTSD, and the petitioner's argument suggested that "trial counsel's failure to independently diagnose PTSD" was unreasonable. *Id.* Here, in contrast, Reddy was diagnosed with PTSD by the psychiatrist that Bruner retained before trial, and Bruner evidently recognized the import of Dr. Fabian's report but nonetheless failed to present any psychiatric evidence. Other PTSD cases addressing a failure to discover PTSD are similarly distinguishable on this basis. *E.g.*, *Payton v. Cullen*, 658 F.3d 890, 893–94 (9th Cir. 2011); *Easley v. Dretke*, 122 F. App'x 124, 128–30 (5th Cir. 2005); *Pruett v. Thompson*, 996 F.2d 1560, 1573 (4th Cir. 1993).

The warden argues that Bruner's decision not to present PTSD evidence was objectively reasonable because Ohio does not recognize the partial defense of diminished capacity. This argument is misplaced. True, "the partial defense of diminished capacity is not recognized in Ohio," *State v. Fulmer*, 883 N.E.2d 1052, 1058 (Ohio 2008), and an Ohio defendant therefore "may not offer expert psychiatric testimony, unrelated to the presentation of an insanity defense, to show that [h]e lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *Wong v. Money*, 142 F.3d 313, 323 (6th Cir. 1998) (applying Ohio law). However, Reddy does not argue that he lacked the mental capacity to form the mental state necessary for aggravated murder or murder; rather, Reddy asserts that PTSD evidence would affirmatively establish the mitigating elements necessary to present a voluntary-manslaughter defense. *State v. Deem*, 533 N.E.2d 294, 298 (Ohio 1988) ("[A]n offense is an 'inferior degree' of the indicted offense where its elements are *identical* to or contained with the

indicted offense, except for one or more additional mitigating elements which will generally be presented in the defendant's case.").

Ohio law makes clear that PTSD evidence is admissible to support that a defendant had the mental state necessary to reduce murder to voluntary manslaughter. For example, the Ohio Supreme Court has held that evidence of battered-child syndrome, which the court described as a form of PTSD, is admissible to support consideration of voluntary manslaughter as a lesser offense to murder. *State v. Nemeth*, 694 N.E.2d 1332, 1336, 1339 (Ohio 1998). Other decisions from the Ohio courts are in accord. *See, e.g.*, *State v. Lawrence*, 541 N.E.2d 451, 455 & n.3 (Ohio 1989) (discussing PTSD in reference to the mental state necessary for voluntary manslaughter); *State v. Warner*, No. 2006-P-0048, 2007 WL 1731628, at *5 (Ohio Ct. App. June 15, 2007) ("Evidence that the defendant is suffering from post traumatic stress disorder is appropriate in a case where the defendant seeks a voluntary manslaughter instruction."); *State v. Sanders*, No. 17718, 2000 WL 1006754, at *3 (Ohio Ct. App. July 21, 2000) (concluding evidence of organic brain disorder is admissible to prove mental state for voluntary manslaughter); *State v. Hall*, No. 91 CA 26, 1993 WL 6578, at *2–3 (Ohio Ct. App. Jan. 19, 1993) (distinguishing diminished capacity from the mental state necessary to show voluntary manslaughter). Thus, we find unpersuasive the warden's argument that PTSD evidence would have been inadmissible at Reddy's trial.

**B. Prejudice**

To establish prejudice, Reddy "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reddy, however, "need not show that counsel's deficient conduct

more likely than not altered the outcome in the case." *Id.* at 693; *see also Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) ("A 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome,' but something less than a showing that the outcome more likely than not would have been different.'") (quoting *Strickland*, 466 U.S. at 693).

Because Reddy was convicted after a bench trial, the record contains the factfinder's views of the evidence and the case, preserved in the transcript of the trial court's ruling on Bruner's motion to acquit, the explanation of the verdict, and the colloquy regarding Dr. Fabian's report during the hearing on remand from the Ohio Court of Appeals. In denying Bruner's motion to acquit on aggravated murder, the trial court asked whether Bruner was asking the court to consider a voluntary-manslaughter charge. After Bruner confirmed that he was, the trial court indicated it would not consider a voluntary-manslaughter defense, at least at the close of the state's evidence: "You don't go from agg murder to voluntary." R. 5-8, PID 904. In other words, because the trial court found there was evidence to show prior calculation and design, Ohio Rev. Code § 2903.01(A), the court concluded that Reddy could not have acted in sudden passion or a fit of rage. *Id.* at § 2903.03(A).

The trial court expanded on this point during resentencing on remand from the Ohio Court of Appeals, acknowledging that courts must "go on to consider" a voluntary-manslaughter defense if the defendant "go[es] forward with evidence tending to show that the killing occurred in a sudden fit of rage provoked by [the] victim," but that Reddy had been "prevented from going on to what's called an inferior offense, going on to talk about the inferior offense, the voluntary manslaughter." R. 5-9, PID 998–99. To this point, the Ohio Supreme Court has explained that a trial court need not instruct the jury on voluntary manslaughter where "nothing in the record indicates that [the defendant] actually was in a fit of passion or rage on the night in question,"

*State v. Thompson*, 23 N.E.3d 1096, 1134 (Ohio 2014), but must include the inferior-degree offense in the jury charge if "the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for the voluntary manslaughter," *State v. Shane*, 590 N.E.2d 272, 274 (Ohio 1992).

At resentencing, the trial court confirmed that it had not considered a voluntary-manslaughter defense at trial after "rejecting the argument that it was murder as opposed to aggravated murder." *Id.* However, the trial court also seemed to acknowledge that Dr. Fabian's report had persuasive value. Reddy's counsel on remand, Valentine, pointed out Dr. Fabian's conclusion that there was a "nexus" between Reddy's homicidal behavior and his mental illness, and the trial court agreed that "Dr. Fabian spends a great deal of this evaluation supporting that conclusion." R. 5-9, PID 986–87. The trial court noted that Dr. Fabian observed with a "reasonable medical certainty" that Reddy was mentally ill, including with PTSD, and that "Dr. Fabian attributes the cause of Mr. Reddy's diagnosis as being the very sad childhood that he experienced at the hands of his mother." *Id.* at PID 986–87. Lastly, the trial court took care to make note that although the report "appear[ed] to have been prepared for trial," it was not "put into evidence" or "touched on in any way," suggesting that the trial court considered the report to be significant. *Id.* at PID 988.

Further, although Bruner adduced testimony to support that Reddy had suffered childhood abuse, evidence of PTSD would not have been cumulative. Testimony describing childhood abuse, standing alone, could support the mental state required for aggravated murder, murder, or voluntary manslaughter. In closing, the prosecution argued that "[i]f we are to believe the testimony of eight years or more of abuse," then Reddy "had eight years to fester a hate for his mother." R. 5-8, PID 935. Although Gloria Reddy was an "abusive woman who

created havoc in everyone's life," *id.* at PID 936, and Reddy "was treated so poorly" by her, he "lived in the same house with her." *Id.* at PID 937. Reddy's decision to continue living with his mother under these circumstances supported that he "acted with purpose and with prior calculation and design," the prosecution argued. *Id.* at PID 937–38. "If he was being abused so bad," he should have left his mother's house, but "he refused." *Id.* at PID 944. This argument in support of an aggravated-murder conviction—that Reddy may have planned to kill his mother because she had abused him—was consistent with, and supported by, evidence of abuse.

PTSD evidence, on the other hand, would support that Reddy acted in sudden passion or a fit of rage and refute that he acted with prior calculation and design. *See, e.g.*, *Warner*, 2007 WL 1731628, at *5 ("The expert testimony may assist the jury in determining if the defendant acted under the influence of sudden passion or acted in a fit of rage."). Dr. Fabian's conclusion that there was a "nexus" between the evidence of mental illness and the homicide strongly supports the mental state for voluntary manslaughter. Indeed, the Ohio Supreme Court has concluded that PTSD evidence has distinct value in demonstrating this mental state. In *State v. Nemeth*, 694 N.E.2d 1332 (Ohio 1998), the defendant was tried for the aggravated murder of his mother and was convicted of murder. *Id.* at 1333. Defense counsel proffered evidence of battered-child syndrome—which the Ohio Supreme Court described as a form of PTSD—in support of a voluntary-manslaughter charge and self-defense, but the trial court excluded the testimony. *Id.* at 1335–36. The Ohio Supreme Court held that the trial court erred in excluding the testimony, and that the error was prejudicial to the defendant, although evidence of abuse had been presented to the jury. *Id.* at 1334, 1336, 1341.

Under the circumstances presented here, we conclude there is a reasonable probability that if Bruner had introduced PTSD evidence, the trial court would have reconsidered the prior-

calculation-and-design element of the government's aggravated-murder case and gone on to find that Reddy had acted in sudden passion or a fit of rage brought on by provocation. Unlike the dissent, we do not understand the trial court's statements to indicate otherwise. The evidence was insufficient to establish prior calculation and design, as the Ohio Court of Appeals explained, and the trial court's comments on Dr. Fabian's report during resentencing support that there is a reasonable probability that PTSD evidence would have tipped the scales at trial in favor of a voluntary manslaughter conviction. Although the Ohio Court of Appeals declined to grant a new trial or modify Reddy's conviction to voluntary manslaughter in Reddy's first direct appeal, the court expressly relied on a presumption that the trial court had rejected inferior-degree offenses. *Reddy*, 948 N.E.2d at 468. But the Fabian report had not been introduced at trial and was not considered when the trial court rejected voluntary manslaughter. In the appeal from the resentencing, the Ohio Court of Appeals relied on its decision in the initial appeal. *Reddy*, 2011 WL 2436596, at *3.

Thus, Bruner's decision not to present PTSD evidence warrants relief because the evidence was sufficiently probative of voluntary manslaughter to establish a reasonable probability that the result of Reddy's trial would have been different. *Strickland*, 466 U.S. at 693.

## IV. Conclusion

For these reasons, we **REVERSE** the judgment of the district court, **CONDITIONALLY GRANT** Reddy's petition for a writ of habeas corpus, and **REMAND** the case to the district court with instructions to order Reddy's release from custody unless the state grants a new trial within 180 days from the date that the mandate issues from this court.

**BOGGS, Circuit Judge, concurring in part and dissenting in part.** I am in accord with the majority on several points. I agree that this is an unusual case in which 28 U.S.C. § 2254(d) does not constrain our review of a state prisoner's constitutional claim. *See Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012). I also share the view that Ohio law allows defendants facing a murder charge to introduce evidence of post-traumatic stress disorder ("PTSD") in support of a voluntary-manslaughter conviction. *See State v. Nemeth*, 694 N.E.2d 1332, 1336 (Ohio 1998). In light of Mr. Bruner's decision to offer such evidence at Reddy's sentencing hearing, I also accept the majority's conclusion that his failure to do so during Reddy's trial cannot be described as "sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). At that point, however, the majority and I part ways. In my view, Reddy has not shown a "reasonable probability" that "the result of the proceeding would have been different" had the trial judge heard evidence of Reddy's PTSD. *Id.* at 694. I would therefore affirm the district court's decision to deny Reddy's bid for habeas relief.

As an initial matter, although the majority views Dr. Fabian's report as clearly establishing that Reddy suffered from PTSD, the report is not quite so conclusive. Fabian did explain that he administered the Detailed Assessment of Post-Traumatic Stress ("DAPS"), a test that mental-health professionals use to detect the presence of PTSD symptoms. But the results did not conclusively show that Reddy had PTSD. Although Fabian concluded that Reddy was, "with reasonable psychological certainty, . . . a mentally ill individual" who suffered from major depressive disorder and personality disorder, he never stated with that same degree of certainty that Reddy suffered from PTSD. Fabian concluded only that Reddy "presents as qualifying for many of the symptoms of PTSD," which appear to be fairly nonspecific. Perhaps for this reason,

unlike Reddy's diagnoses of major depressive disorder and personality disorder, Fabian labeled his diagnosis of PTSD as "provisional" only.

Courts in several contexts have recognized that a "provisional" diagnosis is not as persuasive as an actual one, *see, e.g.*, *Lopez v. Ryan*, 630 F.3d 1198, 1207 (9th Cir. 2011), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc); *Neumann v. Colvin*, No. 3:13-CV-05723, 2014 WL 3671329, at *3 n.4 (W.D. Wash. July 22, 2014), and in adjudicating claims similar to Reddy's, we have held that the *Strickland v. Washington*, 466 U.S. 668 (1984), prejudice inquiry ordinarily demands more than a possibility that a petitioner has a relevant mental illness. In *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001), for example, we rejected a prisoner's claim that he had been prejudiced by counsel's failure to offer evidence of PTSD at trial. Although the petitioner supported his claim with reports from two psychologists who concluded that he "possessed many of the symptoms of PTSD," *id.* at 549, we reasoned that without an actual diagnosis, the argument for prejudice was "much too tenuous," *id.* at 555. Five years later, in *Carter v. Mitchell*, 443 F.3d 517 (6th Cir. 2006), we held that a doctor's opinion, given after trial in support of a state postconviction motion, that "there was] a 'likelihood' that [the prisoner] ha[d] 'some kind of brain related difficulty'" was not sufficiently conclusive to show that the prisoner had been prejudiced by his trial counsel's failure to hire a neuropsychologist to evaluate him before trial. *Id.* at 529–30.

Although I recognize the "potential unfairness that would be created if conclusive evidence of PTSD were required for [a petitioner] to establish a viable ineffective-assistance claim," Reddy's claim is "no doubt weakened due to the want of a proper diagnosis." *Clarke v. Warren*, 556 F. App'x 396, 414 n.10 (6th Cir. 2014). This is particularly true because the probative value of Fabian's report cannot be evaluated in isolation. The court's psychologist

evaluated Reddy as well and informed the court that Reddy suffered from major depressive disorder and acute stress disorder, but apparently not PTSD. In this context, there is reason to doubt whether Fabian's testimony would have carried much weight had Bruner put the diagnosis at issue.

Even ignoring this concern, however, I still have difficulty concluding that Fabian's testimony would create a "reasonable probability" of a different outcome because the trial judge's own statements suggest that during Reddy's trial, she already considered and rejected the possibility that the abuse that Reddy suffered caused him to react disproportionately to his mother's knife attack. At the close of evidence, the judge explained that she did not believe "[t]he defendant's rendition of what happened," namely, that after years of abuse at Gloria's hands, Reddy overreacted to her knife attack, flew into a fit of passion or rage, and choked her to death. When, at Reddy's resentencing hearing, the court addressed Fabian's report, which described a "nexus" between Reddy's PTSD and Gloria's killing, the court did not express surprise or curiosity, instead noting that "having been the trier of the facts in Mr. Reddy's trial, I don't think there is a lot of issue to take with" Fabian's conclusions.

The trial judge's muted reaction to Fabian's report is unsurprising. In *Clarke v. Warren*, 556 F. App'x 396 (6th Cir. 2014), we considered the habeas petition of a woman who killed two men in a robbery. *Id.* at 400. The prisoner claimed that she began to suffer from PTSD two weeks prior to the killings, as a result of being abducted and tortured by another individual unrelated to the robbery. *Id.* at 401, 414. We held that counsel's failure to present PTSD evidence at the prisoner's sentencing hearing was not prejudicial because the court "was aware of the trauma inflicted" on the prisoner, having heard "considerable evidence" of the abduction and assaults. *Id.* at 414. In other words, even though evidence of PTSD is different from

evidence of abuse, *see* Amicus Curiae Br. 13–14, the difference is not so great as to prejudice the defense in every case in which PTSD evidence is omitted, *see Clarke*, 556 F. App'x at 414. Tellingly, in those cases that Reddy cites, in which courts have considered trial counsel's failure to introduce evidence of PTSD or similar disorders to be prejudicial, the trier of fact heard *no* evidence of the underlying abuse or trauma that gave rise to the PTSD. *See Jacobs v. Horn*, 395 F.3d 92, 101–02 (3d Cir. 2005); *Seidel v. Merkle*, 146 F.3d 750, 752 (9th Cir. 1998). The same cannot be said of Reddy's trial.

The majority points out that in *State v. Nemeth*, 694 N.E.2d 1332 (Ohio 1998), the Ohio Supreme Court held that a trial court's refusal to admit evidence of a defendant's diagnosis of battered child syndrome ("BCS") was prejudicial even though the defendant testified to the abuse that he suffered at the hands of the victim. *Id.* at 1336, 1341. But the *Nemeth* court reversed on the ground that the BCS evidence in that case was highly relevant to the defendant's credibility. After reviewing the trial transcript, the *Nemeth* court observed that the jury likely assumed that the defendant had fabricated allegations of abuse because the prosecution repeatedly "impl[ied] [at trial] that [the defendant] must have created the allegations of abuse after the fact because, otherwise, more people would have known about it." *Id.* at 1337. The Ohio Supreme Court emphasized that "[t]he defense need[ed] expert testimony to refute the seemingly logical conclusion that serious abuse could not be taking place if no one outside the home was aware of it." *Ibid.* The same danger did not exist at Reddy's trial, at which numerous witnesses testified that Gloria abused Reddy. Indeed, Bruner repeatedly drew the trial court's attention to that testimony by arguing that because of the abuse, Gloria's provocation prompted Reddy to enter a fit of passion or rage.

What is more, the reasons that the trial court gave for convicting Reddy of aggravated murder cast further doubt upon the majority's assumption that PTSD evidence would have made a difference in this case. At the close of all proof, the trial court explained that it was rejecting Reddy's version of events not because the record was devoid of evidence that would support a conviction for either murder or voluntary manslaughter, but rather because the great weight of evidence showed that the murder did not happen in the way Reddy alleged. The trial court explained that the lacerations on Gloria's face and extensive bruising to her head, as well as the blood stains that Cleveland Police Department found throughout her home, strongly suggested that Reddy acted with "prior calculation and design" when he killed his mother:

> The trouble the Court has in interpreting this evidence as being something other than prior calculation and design stems from the physical damage to the victim and the presence of blood spattering, not only in Joseph Reddy's bedroom, but also in both walls of the hallway . . . as well as the living room. Let's not forget that we had some four or five markers when the detectives came to the home where they found blood on the living room carpeting, the plastic waste paper can, the spot on the drawing, so there were actually three different areas of the home where there are blood spatters.
> The defendant's rendition of what happened never mentions any of the head injuries and when you combine the evidence of the head injuries and all those blood splatters, it strikes the Court as consistent with the beating of the victim as having occurred prior to any choking, so the pattern the evidence presents to the Court and of which I'm convinced beyond a reasonable doubt is whatever the victim may have done to incite or enrage her assailant, Mr. Reddy, the plain fact of the matter is that the sequence of events had to have occurred with the beating of the victim's head in rooms—in various rooms, hallway, living room, Joseph's bedroom. And that had to have . . . preceded . . . her choking.

The probative value that the trial court assigned to this physical evidence of a slow and drawn-out killing strongly suggests that evidence of Reddy's PTSD would have had no impact on the trial court's decision to convict Reddy of aggravated murder. Even assuming that the "[e]xaggerated startle response" that PTSD causes can spur individuals to kill in as methodical a manner as the trial court was convinced Gloria was murdered, Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 272 (5th ed. 2013), the result at trial would have been

no different had PTSD evidence been admitted. Reddy told police that as Gloria was attacking him, he punched her in the face in self-defense, tackled her, and choked her in an attempt to render her unconscious, inadvertently killing her. At trial, Reddy's theory of the case relied on the truth of this account; Bruner argued that Reddy began to choke his mother immediately after she attacked him, and did not realize that the choking was killing her because he was acting under a passion brought on by the combination of Gloria's knife attack and years of abuse at her hands. But in his statement to police, Reddy made no mention of beating Gloria in multiple rooms, which, given the evidence of blood stains throughout the home and extensive injuries to Gloria's head, convinced the trial court that Reddy was lying about how the killing happened. Evidence of PTSD would not have changed that conclusion.

I acknowledge that Reddy's case for habeas relief would be stronger if the trial court had convicted Reddy of murder after having been instructed to disregard the blood-stain evidence and reconsider its verdict. But that never happened. Despite having concluded that the trial judge's reliance on blood-stain evidence was reversible error, the Ohio Court of Appeals did not allow Reddy a second opportunity to argue for voluntary manslaughter. *See State v. Reddy*, 948 N.E.2d 454, 460–62, 468 (Ohio Ct. App. 2010). Although I have doubts about the appropriateness of the state court's reasoning on that point—which is not at issue in this case— PTSD evidence would not have changed the result in the Ohio Court of Appeals. As the majority has explained, that court applied a state-law presumption that "the trial court considered all lesser and included offenses as well as inferior degree offenses," and then explained that it would not remand the case for consideration of voluntary manslaughter because the evidence in the record "was sufficient to convict Reddy of murder." *Id.* at 468. I do not see how evidence that Reddy had PTSD would have weakened the case for deploying the presumption, or how

Fabian's testimony—which a trier of fact could easily discount—would in any way have rendered the evidence "insufficient" to convict Reddy of murder.

In sum, I agree with the majority that if Bruner concluded that Fabian's report was favorable enough to submit to the court for sentencing purposes, there appears to be no reason for why he should have thought it strategic to avoid calling Fabian as a witness at trial. But the particular facts of this case suggest that there is less than a "reasonable probability" that, but for Bruner's decision not to call Fabian to the witness stand, the "result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The majority having taken a different view, I respectfully dissent.